**In the Interest of T.J.O., A Minor Child, D.W. and D.R.W., Parents, Appellants.**

No. 94–668.

Court of Appeals of Iowa.

Nov. 28, 1994.

Robert W. Conrad of Neuzil, Sanderson & Conrad, Knoxville, for appellants.

Bonnie J. Campbell, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Kathrine Miller–Todd, Asst. Atty. Gen., and Mark Kruse, County Atty., for appellee-State.

Jonathan Willier, Centerville, guardian ad litem, for minor child.

Considered by HAYDEN, P.J., and SACKETT and HABHAB, JJ.

HAYDEN, Presiding Judge.

T.J.O., born November 17, 1990, is the son of David and Renee. Renee was married twice and is the mother of five children: M.O., a boy born in 1975; S.A., a girl born in 1980; J.O., a girl born in 1983; T.J.O.; and K.W., a girl born in 1993. Only T.J.O. is the subject of this appeal.

In 1991 only S.A. and T.J.O. were living with Renee. M.O. was living with his maternal grandmother, and J.O. was living with her maternal aunt. M.O. was visiting Renee on May 13, 1991, when Renee got into an argument with David while talking to him on the phone. Renee became angry and shook T.J.O.'s crib, shook T.J.O., and threw him down in the crib. Concerned for T.J.O.'s safety, S.A. and M.O. ran to a neighbor's house to call the police. The police arrived and arrested Renee for child endangerment.

Pursuant to a temporary removal order S.A. and T.J.O. were placed in foster care. After a removal hearing on May 16, 1991, the court confirmed the temporary order. The court found Renee and David each had a previous history of substance abuse and domestic violence. The court determined the children could not be returned to their custody and ordered they be placed with the department of human services (DHS) for placement in foster care. On the same date the State filed a petition alleging S.A. and T.J.O. were children in need of assistance (CINA).

On June 3, 1991, S.A. was adjudicated CINA pursuant to Iowa Code section 232.2(6)(c)(2), and T.J.O. was adjudicated CINA pursuant to Iowa Code sections 232.2(6)(c)(2) and 232.2(6)(b) (1991). S.A. was placed in the custody of her maternal aunt, and T.J.O. was placed in the custody of DHS for placement in foster care. The court ordered Renee and David to undergo substance abuse, psychiatric, and psychological evaluations. The court further ordered a crisis assessment of the family be undertaken by Iowa Children and Family Services, homemaker services be provided to Renee and David, and Renee and David be allowed supervised visitation.

Renee had a psychiatric evaluation in July 1991. Her evaluator recommended she continue with counseling and undertake reinforcement therapy for her alcohol problem. In November 1991 David was convicted of operating a motor vehicle while under the influence; Renee was convicted of the same offense in December.

At a January 1992 review hearing the court ordered S.A. continue in her maternal aunt's custody and T.J.O. remain in foster care. The court also ordered David and Renee undergo substance abuse evaluations and participate in individual counseling. Following a March 1992 substance abuse evaluation it was recommended Renee abstain from all mood altering chemicals, attend weekly Alcoholics Anonymous meetings, complete OWI school, and attend aftercare.

After an August 1992 review hearing the court found David had not completed any of the ordered evaluations and Renee had not pursued her recommended aftercare treatment. The court ordered T.J.O. and S.A. continue in their placements and DHS prepare and file a petition for termination of parental rights with respect to T.J.O. In September 1992 the State filed its petition to terminate. Following a February 1993 review hearing the court continued the children's placements and found Renee had not requested visits with T.J.O. since the last review hearing but had seen him at her mother's home. After several continuances a hearing on the petition was held in January and March 1994.

At the hearing evidence was presented David and Renee were married in December 1993. At the time of the hearing David had been steadily employed for two and one-half years. Renee was staying home to take care of K.W., born in 1993. In December 1993 David and Renee underwent psychological evaluations, but further counseling services were not recommended for either of them. Renee also underwent another substance abuse evaluation in February 1994, and it

was recommended she attend outpatient treatment to assist her in remaining sober. Both Renee and David testified they had never had a problem with domestic violence, they had both stopped drinking, and they could care for T.J.O.

A family therapist, Doran Bollman, testified neither Renee nor David had requested his services for visitation from August 1992 until December 1993. Bollman stated he did not believe the parents had fully acknowledged or dealt with their problems with substance abuse and domestic violence. DHS caseworker Jon Wagner testified he did not think T.J.O. could be safely returned to Renee's and David's care. Both Bollman and Wagner acknowledged since December 1993 David and Renee were making positive changes in their lives.

On March 14, 1994, the court concluded Renee's and David's parental rights over T.J.O. should be terminated pursuant to Iowa Code section 232.116(1)(c) and (g) (1993).

Renee and David appeal. They first argue it is not in T.J.O.'s best interest to be separated from his sister, K.W. Renee and David next contend the court erred in finding the circumstances which led to T.J.O.'s CINA adjudication continue to exist. They claim there was not clear and convincing evidence presented they continue to have problems with drug and alcohol abuse or domestic violence. We disagree. We affirm the juvenile court's termination of Renee's and David's parental rights.

## I. Scope of Review.

■ Appellate review of termination proceedings is de novo. *In re W.G.*, 349 N.W.2d 487, 491 (Iowa 1984), *cert. denied*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985) (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981)). We give weight to the findings of fact of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92.

■ The primary concern in termination proceedings is the best interest of the child.

Iowa R.App.P. 14(f)(15); *Dameron*, 306 N.W.2d at 745 (citation omitted).

We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*In re R.M.*, 431 N.W.2d 196, 199 (Iowa App. 1988) (citing *Dameron*, 306 N.W.2d at 745).

With these principles in mind, we address the substantive issues on appeal.

## II. Separation of Siblings.

■ The first issue is whether the juvenile court erred in separating the siblings, T.J.O. and K.W. There is no indication in the record this issue was raised in the juvenile court. As a general rule, an issue not presented in the juvenile court may not be raised for the first time on appeal. *In re R.J.*, 495 N.W.2d 114, 117 (Iowa App.1992) (termination proceeding) (citation omitted).

■ Even if this issue was preserved, these siblings have never resided together. There is no evidence in the record the two have even seen each other. None of the mother's older children reside with her. One child is with grandparents, and two children are with an aunt. T.J.O. is now strongly bonded to the foster parents with whom he has spent almost his entire life.

■ Our supreme court has held that wherever possible brothers and sisters should be kept together. *In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982) (citation omitted). However, the paramount concern in these cases must be the child's best interests. The record is clear it would not be in T.J.O.'s best interests to now seek to establish a relationship with a sibling he does not even know. We affirm on this issue.

### III. *Termination of Parental Rights.*

The second issue is whether the juvenile court erred in terminating the parents' parental rights to T.J.O. pursuant to Iowa Code sections 232.116(1)(c) and (g) (1993). Renee and David contend the court erred in finding the circumstances which led to T.J.O.'s CINA adjudication continue to exist. They claim there was not clear and convincing evidence presented they continue to have problems with drug and alcohol abuse or domestic violence. We disagree.

Iowa Code section 232.116(1)(c) provides for termination of parental rights when

c. The court finds that both of the following have occurred:

(1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.

(2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

Iowa Code § 232.116(1)(c)(1), (2) (1993).

T.J.O. has been adjudicated to be in need of assistance after a finding the child has been physically abused and/or neglected by his mother. There is clear and convincing evidence the circumstances which led to the adjudication continue to exist. At the time of adjudication, there was concern with domestic violence, the use of drugs and/or alcohol, and the children's safety in the home.

For children the age of T.J.O. the law has recognized parents must move quickly to rectify their personal deficiencies. Within the eight months following T.J.O.'s removal, the parents had each been convicted of OWI, the father had been arrested for domestic violence against the mother, and the mother continued to drink.

These circumstance exist despite the offer or receipt of services. The mother's psychi-atric evaluation recommended counseling for anger control and stress management. The mother's substance abuse evaluation indicated she was chemically dependent and aftercare was necessary. The crisis assessment conducted at the beginning of the juvenile proceedings noted a great deal of denial and minimization of the problems in the home.

Despite expert direction, Renee and David have not satisfactorily addressed their problems. Although David has been arrested for OWI and for domestic violence since the adjudication, he has availed himself of no services. The mother completed substance abuse and psychiatric evaluations which recommended further services. She has chosen not to use them. A substance abuse evaluation conducted in February 1994 assessed the mother as being in the crucial to chronic stage of chemical dependency. The parents have received no counseling for domestic violence, no counseling for anger control, no counseling for stress management, and no counseling for their relationship problems.

It is vital in a juvenile matter the parent(s) recognize abuse occurred. "[T]he requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs." *In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa App.1988). The parents have consistently refused to acknowledge their role in the events behind the initial adjudication.

It is not a valid argument, as the parents contend, it is safe to return T.J.O. to the home because there is no evidence K.W. has ever been harmed. Even though a mother may be able to parent some of her children does not necessarily mean she is capable of providing appropriate care to all her children. The special needs and best interests of each child must be evaluated. *In re E.B.L.*, 501 N.W.2d 547, 553 (Iowa 1993) (citation omitted).

T.J.O. has clearly bonded with his foster parents. He has been with the same parents since his removal at six months of age. He has now been there three years. He is not bonded to his parents because of

their infrequent and irregular visitation. For children the age of T.J.O., the law has recognized parents must move quickly to rectify their personal deficiencies. "Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990).

■ The parents' greatest efforts have come since the beginning of the termination hearings. For T.J.O., these efforts came too late. He cannot be returned to his parents without again being adjudicated a child in need of assistance. It is in T.J.O.'s best interests for his parents' parental rights to be terminated and for him to be free for adoption. Judgment of the juvenile court affirmed.

**AFFIRMED.**

HABHAB, J., concurs.

SACKETT, J., dissents.

SACKETT, Judge, dissenting.

The majority has found problems that existed when Tyler was removed still exist in Renee and David's home. At the termination hearing the following evidence was introduced. A psychological evaluation of the father, David, administered by the South Central Mental Health Center, Inc. of Oskaloosa, Iowa, dated 12–06–93, revealed the following:

> [David] seemed fairly open in his discussion of his life and current dealings with Juvenile Court. Based on his presentation, use of vocabulary, and in response to the Incomplete Sentence—his general intelligence level is estimated as normal.

> Without pretense, [David] openly describes his disappointments from earlier life, his bad choices and current hopes about his new marriage and family. He has, . . . been in trouble with his alcohol abuse. In response of losing his former wife and contact with the children, [David] admittedly dealt unwisely with the pain. However, he states that he soon came to his senses, found the inner strength to stop focusing on the pain and used that change

of attitude to help bring control over the pattern of alcohol use.

> [David], writes on the Incomplete Sentences, "I'm very happy to be alive," and "My nerves are a lot better than they used to be." Such statements seem to reflect his new sense of appreciation for his life. He speaks highly of his wife, Renee, and their infant daughter, Katie. *It is my impression that [David] has the capacity and desire to provide a safe and nurturing home for his wife's 3 year old son, [T.J.O.].* (Emphasis supplied).

A psychological evaluation of the mother, Renee, administered by the South Central Mental Health Center, Inc. of Oskaloosa, Iowa, dated 12–06–93, revealed the following:

> By general conversation, vocabulary and her work completing the sentences, [Renee] seems of average intelligence. Her written responses were fairly insightful and generally of a positive tone. She talks openly about her background and the many hardships she experienced in her life. In the past she has often seen things as beyond her control. Likely she has found much of her past life disappointing. Drug use was a form of escape and rebellion (now behind her). She likely has felt misunderstood and unappreciated by others, finding it hard to trust other people. Presently, however, she is at a point in her life (based on recent period of stability) where she can write "My nerves are improving greatly."

> There is much from her past that she wants to put behind her, and wants others to do the same. In her mind she has paid for those mistakes and learned from them. Instead, she focuses more on the present moment. *Her current daughter, 10 month old Katie, is tangible evidence of her parenting skills. Katie was in attendance during both of my contacts with Renee, and they seem to have a relaxed and open relationship.* Katie was seen as generally quiet and cordial during the contacts. Efforts by the mother to dissuade Katie from playing with the electrical outlets were successful; Katie was easily coaxed into different, safer activities.

*It is my impression, that Renee has the capacity and desire at this time to provide a safe and nurturing environment for her children.* (Emphasis supplied).

A report of an In–Home Family Therapist working for Children & Families of Iowa and dated January 10, 1994, states the following:

*Based on my two visits to ... [David and Renee's] home ... it appears things are going better* for David and Renee. They were married a few weeks ago and say their relationship is stable. *Their infant daughter, Katy, appears to be a healthy, well adjusted one year old child. Renee demonstrated affection and proper supervision of Katy while this worker was in the home and again at her mother's home* ... [David and Renee's] residence ... is a small, modest two bedroom house, but *it is very clean and well furnished....* Renee described the relationship she has with an elderly couple who live next door who have no children in the area. She takes Katy next door almost every day to see them. David ... has worked at the Raiser Rock Quarry since he left Centerville. David says he works a lot of overtime (often 70 hours per week in the summer). [David] says he needs the overtime to make ends meet because he has to pay so much child support for his four children from a previous marriage.

During the two hour supervised visit at Renee's mother's house on January 8, this worker observed Tyler's relationship with his biological parents. [T.J.O.] has been in the ... foster home for approximately two and one-half years, so quite understandably, he is closely bonded to his foster parents. This is even more than usual the case with Tyler, because the ... foster home has been a very loving, nurturing home for Tyler. Tyler clung to his foster mother when she left him with Renee and David. Tyler quickly entered into play with toys and soon was enjoying himself playing with David and Renee. Tyler does not appear to have a child-parent bond to his parents but sees them enough, and the visits have been pleasant, so he enjoys very much playing there. Renee and her mother have also taught Tyler the family

members, so Tyler knows David and Renee, his grandmother, and Michael, who is Renee's oldest son who lives with her parents. The visit between Tyler and his parents was pleasant and he told his foster mother he had fun when she returned to pick him up. This visit was all in a play mode and thus no real test of how effective Renee and David would be in parenting Tyler after his two and a half years out of their home. *It did demonstrate that David and Renee have affection for Tyler and knew how to relate well to him during the visit.* (Emphasis supplied).

When questioned, John Wagner, who works for the Department of Human Services, testified as follows:

Q. *Focusing,* if you would for a moment just *on the circumstances that presently exist, have you any information regarding the home in which David and Renee live?* A. *Yes,* sir.

Q. Would you please describe that home for the Court? A. *That home is a single-family dwelling* in ... Iowa. *It is neatly kept, cleaned.* When I was there in October of 1993, *I saw no visible signs that there were* any—There wasn't *any situation that would be dangerous to an infant or a toddler.* From what I saw of the home, *there is ample space for a family of four,* perhaps five. I did not see the backyard. I saw the front yard. It was an average size front yard.

Q. Is this the type of home that could accommodate, then, Tyler if he were placed back into the family? A. I believe the home environment is—the house—the infrastructure and the house is certainly— would certainly accommodate another child in the home.

Q. You've visited places where Renee has lived in the past. Has she always been a good housekeeper? A. I visited Renee's home here ... on several occasions, and I never say anything in the home that would indicate that it was cluttered, dirty, filthy. It was a very neatly kept home.

Q. Was Katie in the home when you visited last? A. Yes, she was.

Q. *Did you observe any interaction be-tween Katie and Renee at that time?* A. *Yes,* I did.

Q. *Would you be able to describe that as an affectionate relationship between moth-er and daughter?* A. *Yes,* I would charac-terize it that way.

Q. *A loving relationship?* A. It appeared to be a loving relationship.

Q. *Did Katie seem to be adequately cared for when you saw her?* A. *Yes.*

Q. *Was she neat and clean?* A. *Oh, yes.*

Q. *The situation as it exists also includes the fact that David ... has now main-tained employment for some period of time?* A. *Correct.*

Q. And this would be a circumstance, wouldn't it, that might be different now than it was at the time that Tyler was removed from the home? A. I believe that [David] was not full-time employed when Tyler was removed from the home.

Q. And *so this would be different now and something that you would look at as a positive in the family setting?* A. *Yes, I think it's positive in at least two ways. First of all, it does provide financial secu-rity, and I do believe that it does lend some stability to the home environment.*

Q. So in terms of stability of the home environment, that circumstance now would be one that could be described as at least more stable than it was at the time that Tyler was removed from the home? A. Yes, I believe that is a fair characterization of the stability.

Q. And isn't it also true that at the time Tyler was removed from the home, Renee was unmarried? A. That's correct.

Q. And the economic situation wasn't nearly as stable or as good as it is now? A. Yes, I believe that's correct.

Q. *In your visiting with Renee, you've had no cause to believe that you needed to report anything negative about her care of Katie, did you?* A. *No, sir.*

Q. *In your visits with Renee when you dropped in on her, was there any evidence to you that she was under the influence of any alcohol or drugs?* A. *No, sir.* (Em-phasis supplied).

I would find Renee and David have made substantial gains and are taking excellent care of a young child in their home. Termi-nation severs Tyler's relationship with his biological parents and sibling.

Tyler has bonded with his foster family, and they wish to adopt him. This causes me to want to affirm. But to terminate parental rights there must be clear and convincing evidence Tyler cannot be returned home. I do not find the state has met the required level of proof. I would reverse.