# IN THE COURT OF APPEALS OF IOWA

No. 14-0980
Filed October 1, 2014

**IN THE INTEREST OF A.S. and E.S.,**
**Minor Children,**

**J.S., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Linn County, Barbara H. Liesveld, District Associate Judge.

A mother appeals the termination of her parental rights to two children. **REVERSED AND REMANDED.**

Zachary D. Crowdes, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant County Attorney, Jerry Vander Sanden, County Attorney, and Kelly Kaufman, Assistant County Attorney, for appellee

Kimberly Opatz of Linn County Advocates, Cedar Rapids, for father of E.S.

Troy Powell of Powell Law Firm, Cedar Rapids, for father of A.S.

Carrie Bryner, Cedar Rapids, attorney and guardian ad litem for minor children.

Considered by Potterfield, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

This termination-of-parental-rights case involves a hard-working mother who has a very close bond with her four-year-old son and eleven-year-old daughter and interacts well with them during supervised visits. On appeal, she argues the State failed to prove by clear and convincing evidence either (1) the children could not be presently returned to her care, or (2) she has a severe substance-abuse disorder that prevents her from safely parenting the children. She also contends terminating her parental rights will be detrimental to the children due to the closeness of their relationship.

After reviewing the entire record de novo—including the three months leading up to the termination hearing—we reject the State's claim that clear and convincing evidence supports the statutory grounds for termination. While admittedly the mother's greatest strides came at the end of the year, we do not believe that is cause for ignoring their significance. We also agree with the mother's argument that severing ties would have a negative impact on her children under the standards in Iowa Code sections 232.116(2) and 232.116(3)(c) (2013). Accordingly, we reverse and remand.

At interest in this case are A.S., who was born in 2003, and E.S., who was born in 2009. The record shows E.S. is an active four-year-old and is meeting developmental milestones. The record also shows that his sister, A.S., is a bright youngster, who has been diagnosed on the autism spectrum. Because of that condition, A.S. "thrives on very extreme structure," according to the DHS case worker.

The mother was eighteen when her daughter A.S. was born. At birth, A.S. tested positive for THC, the active component in marijuana, resulting in a founded child abuse report from the Department of Human Services (DHS). The mother did not have a substance abuse assessment or engage in treatment at that time.

The family came to DHS attention again in January 2012, when A.S.'s father was arrested for a probation violation and was caring for the girl while "heavily intoxicated." A.S. was returned to the mother's care later that month on the condition that the mother and children live with the maternal grandmother. One year later, both A.S. and E.S. were removed from parental custody after the parents tested positive for synthetic marijuana. At that time, the mother and children were living with E.S.'s father. The juvenile court adjudicated A.S. and E.S. as children in need of assistance (CINA).[1] The DHS placed the children in separate foster homes.

The mother maintained employment throughout the case. Until November 2013, she worked the second shift (3:30 p.m. to midnight) at LeanCor, a company in North Liberty, where she had been employed for three years. Her commute was forty-five minutes to an hour each way. She balanced that employment with substance treatment in the mornings, as well as visitations with her children. She testified these demands on her time made it challenging to satisfy the DHS drug testing requirements, especially on days when the testing center's "drop hours" were limited to 2 p.m. to 7 p.m. In the absence of a finding

---

[1] The adjudication date for A.S. was March 7, 2012 and for E.S. was February 5, 2013.

from the juvenile court that the mother's version was incredible, we give credit to her explanation for the missed drug tests.

The mother testified that in mid-December of 2013, she quit her job with LeanCor so she could focus on attending visitations with her children and could comply with the demands of substance testing and treatment. To continue to support herself and achieve stability for reunification with the children, the mother replaced the one full-time job with three part-time positions, working various hours at Wendy's, the Aladdin Restaurant, and for a temp agency. Since changing jobs, the mother has not missed a drug test and has been consistent in her visitations.

The State filed the petition to terminate the mother's parental rights on December 23, 2013. The juvenile court held a contested hearing on March 10 and March 14, 2014. On May 22, 2014, the district court issued its order terminating the mother's parental rights, citing Iowa Code sections 232.116(1)(f) and (*l*). The mother now appeals.[2]

### A. Statutory Grounds for Termination

We review termination proceedings de novo. *In re A.M.*, 843 N .W.2d 100, 110 (Iowa 2014). Although we give weight to the juvenile court's fact finding—especially when assessing witness credibility—we are not bound by its determination. *Id.* The grounds for termination must be supported by clear and convincing evidence. *In re D.S.*, 806 N.W.2d 458, 465 (Iowa Ct. App. 2011). Evidence is "clear and convincing" when there are no serious or substantial

---

[2] The children have separate fathers. The juvenile court also terminated their parental rights, but neither father appeals.

doubts as to the correctness of conclusions of law drawn from the evidence. *Id.* The clear-and-convincing standard is more burdensome than proof by a preponderance, but less so than proof beyond a reasonable doubt. *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013).

The juvenile court based its termination decision on two statutory grounds: section 232.116(1)(f) and (*l*). We will examine the evidence supporting each of those grounds in turn.

Section 232.116(1)(f) has four elements: the State must show by clear and convincing evidence (1) the child is four years old or older, (2) has been adjudicated CINA, (3) has been removed from his or her home for twelve of last eighteen months, and (4) cannot be returned to the parent's care as provided in section 232.102 at the present time. As the mother argues in her petition on appeal, the dispositive issue is the fourth element—whether the children can be safely returned to her care.

The mother turns to the language of section 232.102, contending the State did not offer clear and convincing evidence that returning the children to her care would put them at risk of physical abuse or some other harm justifying a CINA adjudication. Children cannot be returned to a parent's custody under section 232.102 if by doing so they would remain a CINA or would be exposed to any harm amounting to a new CINA adjudication. *See In re R.R.K.,* 544 N.W.2d 274, 277 (Iowa Ct. App. 1995), *overruled on other grounds by In re P.L.,* 778 N.W.2d 33, 39 (Iowa 2010); *see also In re M.M.,* 483 N.W.2d 812, 814 (Iowa 1992) ("The

threat of probable harm will justify termination, and the perceived harm need not be the one that supported the child's initial removal from the home.").

The State's responsive petition on appeal does not focus on what, if any, evidence shows harm would befall the children if they are returned to their mother's care. Instead, the State's argument is a free-ranging indictment of the mother, claiming she "has yet to make a choice that would put the welfare of her children over feeding her addictions and chaotic lifestyle." We find this accusation unsupported by the record.

The evidence showed the mother's last positive drug test, which was for synthetic marijuana, was June 17, 2013—nine months before the termination hearing. The mother's undisputed testimony was that when she did use synthetic marijuana, she never did so while supervising the children. The DHS case worker testified that from December 2013 until March 2014, the mother's substance abuse treatment has had a positive impact on her. The record showed the mother had been living with the grandmother and the DHS had no concerns about that home. The DHS worker also acknowledged it was possible for the mother to provide a stable residence for her children. The worker also admitted the mother was likely to be more consistent in her engagement with the children now that she had ended her relationship with E.S.'s father.

The State's brief also quotes liberally from the mother's recent mental health evaluation, which recommended she participate in individual counseling for depression and anxiety. The State argues the mother has "never addressed these issues appropriately." But the State does not acknowledge the evidence

that the mother has been unable to qualify for health insurance that would cover the recommended treatment and medication. The DHS case worker testified she was aware of the mother's struggle to obtain insurance. The DHS worker also disagreed with the mental health evaluator's view the mother needed remedial work on her parenting skills, testifying, "From what I observed overall, I would say [the mother] does a really good job with her children."

The State notes that visitation remained fully supervised at the time of the termination hearing. While this is true, the DHS provided an unsatisfying explanation as to why it limited the mother's time with the children. The mother testified since she quit her second-shift job in December, she had repeatedly asked for more evening visits with her children, but the worker said they could not be scheduled. The DHS case worker testified that despite the mother being consistent in attending visits since December, the worker needed to see yet more consistency for the children's sake.

When we view the evidence presented at the termination hearing in its entirety, we do not find clear and convincing proof that A.S. and E.S. would be exposed to harm of the kind that would merit a new CINA adjudication if returned to the mother's care. The mother has not used synthetic marijuana, or other illicit drugs, since June 2013. The mother gave up stable employment to comply with the directives of the DHS to achieve reunification with her children. Her visits with the children are consistent and go very well. By all accounts, she is progressing in her substance abuse treatment. The State's suggestion of possible harm is too elusive to qualify as clear and convincing evidence.

We next examine the second ground for termination, section 232.116(1)(*l*), which has three elements: the State must prove: (1) the children have been adjudicated CINA and their custody has been transferred from the parent for placement under section 232.102, (2) the parent has a severe substance-related disorder and presents a danger to herself or others as evidenced by prior acts, and (3) there is clear and convincing evidence the parent's prognosis indicates that the children will not be able to be returned to the custody of the parent within a reasonable period of time considering their age and need for a permanent home. The mother argues the record lacks clear and convincing proof of elements two and three. We agree.

The mother testified she was addicted to marijuana and synthetic marijuana, known as K2, but by the time of the termination hearing she had been successfully engaging in treatment for three months and had not used drugs for nine months. She testified she occasionally drank wine with dinner, but did not get drunk and did not believe that she risked relapsing based on this alcohol consumption. The State did not present any evidence to the contrary. In fact, the DHS worker testified that since December the mother "has been doing wonderfully in substance abuse treatment."

Nowhere in the record is the mother's substance-related disorder described as "severe" and the State did not offer evidence that her drug addiction continued to present a danger to herself or others. The mother has been able to successfully maintain employment throughout the case and is now in drug treatment and undergoes regular drug testing. The record does not reveal a

prognosis for the mother that would prevent returning the children to her custody within a reasonable period of time considering their age and need for a permanent home.

Our supreme court has said "a parent who was once unfit may not automatically be deemed forever unfit." *In re D.J.R.*, 454 N.W.2d 838, 845 (Iowa 1990). That is not to say that parents can take their time in addressing their problems. We adhere to "the principle that the statutory time line must be followed and children should not be forced to wait for their parent to grow up." *In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998). In this case, we recognize the mother realized late in the game that she needed to comply with the DHS expectations or face termination of her parental rights. But she did arrive at that realization approximately three months before the termination hearing. We do not believe it was proper to discount her improvement from December 2013 through March 2014 simply because the CINA case was on a trajectory toward termination. The State bears the burden to satisfy the statutory elements under section 232.116(1) by clear and convincing proof. The State did not carry its burden in this case.

### C. Best Interests and the Family Bonds

The mother also argues termination was not in the children's best interests, citing Iowa Code sections 232.116(2) and (3). The best-interest decision depends on the factors in section 232.116(2), including the children's safety, the best placement for their long-term nurturing and growth, and their physical, mental and emotional condition and needs. The "factors weighing

against termination in section 232.116(3) are permissive, not mandatory, and the court may use its discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (citation and internal quotation marks omitted).

The mother contends the strength of her bond with the children weighs against termination of her parental rights. *See* Iowa Code § 232.116(3)(c) (the court need not terminate the relationship between the parent and the child if the court finds "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). She asserts her connection with the children is "undisputed" and "the benefit of being raised by their biological mother would far outweigh any minimal harm" from giving her additional time to resume custody.

In our discretion, we find the unique circumstances of this case and the best interests of A.S. and E.S. tip the scale toward saving the mother-child relationship. Three factors strongly influence our decision: (1) the mother's close relationship with both children, (2) the mother's proven ability to meet the special needs of A.S., given her autism diagnosis, and (3) the termination's effect of separating the siblings from each other and from their maternal grandmother.

The record is replete with descriptions of the special connection between this mother and her children. E.S.'s father, who was estranged from the mother by the time of the termination hearing, testified she was an "excellent mother" who would not "put the kid's in harm's way." This father was living with A.S. and

the mother in a FEMA trailer after the Cedar Rapids flood when the mother became pregnant with E.S. He described the mother and A.S. as "two peas in a pod." He said the mother takes a lot of time with her daughter "because of what she's been through with [A.S.] as far as her autism and all of that." And he testified A.S. "loves to be around her mom."

When asked about her children, the mother testified: "I love them both to pieces." The mother attributed her "really, really strong bond" with A.S. to the girl's autism and all that they had been through together. The mother also described an attachment with E.S.: "We also have a strong bond. He's a cuddler. He loves to sit and cuddle and watch movies."

The DHS case worker confirmed the mother has a strong bond with both children. The worker acknowledged the mother enrolled A.S. in a special school program to address her autism while the girl was still in her care. The worker also explained that E.S. is "devastated" when an expected visit with his mother does not occur. The FSRP (family safety, risk, and permanency) worker also testified that termination would be hard on the children.

On the issue of the relationship between the siblings and with their maternal grandmother, the record shows the DHS gave too little value to these ties. The mother testified A.S. and E.S. love each other, but because they're rarely together while in foster care, their relationship has become strained. When the DHS case worker was asked whether she was concerned about splitting up the children, she responded: "Ideally, the department would always like to have children placed together, if possible. However, I think at this point moving the

children would be more damaging than helpful." We do not believe the pure momentum of a CINA case should control the best-interests determination. Our supreme court has held that whenever possible brothers and sisters should be kept together. *In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982); *In re T.J.O.*, 527 N.W.2d 417, 420 (Iowa Ct. App. 1994). If A.S. and E.S. can be ultimately reunited with their mother, the children will benefit from being with their natural sibling.

We take a similar view toward the children's relationship with their maternal grandmother. The grandmother testified at the termination hearing that she has a very strong bond with the children and as the "matriarch" of the family she would step in if she perceived any risk of harm to A.S. or E.S. The State offered evidence the foster families have been good about allowing the children to maintain a relationship with the grandmother, but the possibility that connection will be preserved on some level is not the same as returning the children to the care of their extended biological family.

Given our findings above, we conclude the State did not meet its burden to prove the grounds for termination by clear and convincing evidence. We also believe it was not in the best interests of the children to sever the legal ties to their mother. Accordingly, we reverse the order terminating the mother's parental rights and remand the case for further proceedings with the permanency goal of reuniting the children with their mother.

**REVERSED AND REMANDED.**