**IN THE COURT OF APPEALS OF IOWA**
No. 19-1499
Filed November 6, 2019

**IN THE INTEREST OF L.J.,**
**Minor Child,**

**L.J., Mother,**
        Appellant.
_____


        Appeal from the Iowa District Court for Polk County, Rachael E. Seymour,

District Associate Judge.


        A mother appeals the order terminating her parental rights to her daughter.

**AFFIRMED.**


        Emily DeRonde of DeRonde Law Firm, PLLC, Johnston, for appellant

mother.

        Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer, Assistant

Attorney General, for appellee State.

        Kathryn Miller of Juvenile Public Defender, Des Moines, attorney and

guardian ad litem for minor child.


        Considered by Doyle, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

Four-year-old L.J.'s infant brother, C.J., died after their mother gave him an overdose of Benadryl in January 2018. The family was living in room 207 of the Motel Relax when the mother found C.J. unresponsive. L.J. and her older sister were sleeping on cots in the room when police responded to their mother's 911 call. The State charged the mother with child endangerment and obtained a no-contact order preventing the mother from interacting with her daughters. More than one year after the State removed L.J. from her mother's care, the child continued to have nightmares about her brother's death.

Sixteen months after removal, the juvenile court terminated the mother's parental relationship with L.J.[1] The mother appeals that termination order, contesting the statutory grounds under Iowa Code section 232.116(1) (2019), the best-interests determination under section 232.116(2), and the Court's decision to not apply the permissive factor in section 232.116(3)(c). She also claims the State did not make reasonable efforts to reunite her with L.J. Like the juvenile court, we see the mother's pattern of neglect as blocking her path to reunification with L.J. After our independent review of the record, we affirm the termination of parental rights.[2]

---

[1] The juvenile court did not terminate the mother's parental relationship with L.J.'s older sister in this order. The court also terminated the father's rights to L.J., but he did not appeal.

[2] We review child-welfare appeals de novo, which means we examine both the facts and law and adjudicate anew those issues properly preserved and presented. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App.1995). The State bears the burden to prove the allegations in its petition by clear and convincing evidence. *See* Iowa Code § 232.96(2). That standard requires more than a preponderance of evidence but less than proof beyond a reasonable doubt. *See L.G.*, 532 N.W.2d at 481. To affirm, we must have no serious or substantial doubt about the correctness of a particular conclusion the juvenile court has drawn from the evidence. *Id.*

## I. Facts and Prior Proceedings

With her two daughters in tow and nine months pregnant with C.J., the mother moved from Alabama to Iowa in the summer of 2017. She did so in violation of an Alabama court order placing custody of the older daughter with her father. The mother alleges the father had a history of assaulting her. At the time of her move, Alabama child protection workers were investigating the mother for leaving four-year-old L.J. home alone. The mother minimized the incident, claiming she went to the store to get milk while L.J. was asleep in bed. About the same time, the mother sent her two teenaged sons to live with their father in Tennessee, though they had not been in his care before.

In Iowa, the mother stayed with relatives before moving into a motel with her three children. In mid-January 2018, police arrived at the motel to investigate an assault against the mother by her paramour. The paramour admitted strangling the mother while she was holding six-month-old C.J. in the motel hallway. Police arrested the paramour, and the mother obtained a no-contact order.[3]

About a week later, police and paramedics returned to the motel to find a lifeless infant in the room with the mother and her two daughters. The room was littered with dirty clothes and garbage; liquor and medicine bottles were accessible to the children. At the scene, the mother said C.J. was sleeping in her bed when she awoke in the early morning hours to find him not breathing. But others in the

---

[3] The mother violated this no-contact order in February 2018 by renewing interactions with her paramour.

motel told police that after midnight they had seen and heard the mother in another room in the motel, a floor away from the room where her children slept. The mother told emergency responders she had not given the baby any drugs. She later admitted giving him a "little bit of Benadryl" because he was fussy. An autopsy revealed the baby had "acute diphenhydramine intoxication." The toxicology report described diphenhydramine as "a sedating over-the-counter medication." In connection with C.J.'s death, the State charged the mother with felony child endangerment. She pleaded guilty to a lesser-included aggravated misdemeanor. The sentencing order prohibited the mother from having contact with her daughters.

Not surprisingly, C.J.'s death shattered this already fragile family. After the mother faced criminal charges, the Iowa Department of Human Services (DHS) removed L.J. from her care. The juvenile court adjudicated L.J. as a child in need of assistance (CINA) in May 2018. The next month, in a dispositional order, the court noted L.J. "displayed behavioral issues while in shelter which made her difficult to place, and has suffered the trauma of the death of a sibling, separation from another sibling and separation from her mother in the last five months." Even after the DHS placed L.J. in a foster home, she acted aggressively in her kindergarten class—including "screaming and cussing."

In the ensuing months, the mother made little progress toward reunification. She was slow to comply with the juvenile court order to complete substance-abuse and mental-health evaluations. When the mother did obtain a substance-abuse evaluation, she failed to report her alcohol use. She was also diagnosed with major

depressive disorder, anxiety disorder, and borderline personality disorder. In August 2018, the mother attempted suicide—for the third time since C.J.'s death.

In April 2019, the State petitioned to terminate the mother's parental rights. About one month later, the mother sought modification of the no-contact order after having no interactions with L.J. for more than one year. The juvenile court held a termination hearing in June 2019. L.J.'s therapist testified that the five-year-old described "having some nightmares about her brother." L.J. told the therapist that she "missed her mom." The therapist recommended any visitation between L.J. and her mother start in a "therapeutic setting." She opined that grief and trauma can make a parent "emotionally unavailable to their child."

The mother testified she was on a medication regimen for her mental health and had been seeking help from a therapist and a domestic-violence advocate. In her testimony, the mother acknowledged a history of neglecting her children, but insisted she had "changed" and she "knew better now." She discussed C.J.'s death saying, "I learned my lesson with him." But she also insisted C.J. "did not die from a Benadryl overdose. The Benadryl was not lethal enough to kill him."

In an August 2019 order, the juvenile court terminated the mother's parental rights to L.J. under Iowa Code section 232.116(1), subsections (e) and (f). The mother now appeals.

## II. Analysis

Terminations follow a three-step analysis. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). First, the juvenile court must decide if the State proved one of the grounds listed for termination in section 232.116(1). *Id.* After finding that proof by clear and convincing evidence, the court must consider if termination is in the best

interests of the child by applying the factors in section 232.116(2). *Id.* Then, if the factors require termination, the court must see if any circumstances in section 232.116(3) compel foregoing termination. *Id.*

## A. Statutory Grounds and Reasonable Efforts

When the juvenile court terminates parental rights on more than one ground, "we need only find termination appropriate under one of these sections to affirm." *In re J.B.L.*, 844 N.W.2d 703, 704 (Iowa Ct. App. 2014). Here, we focus on section 232.116(1)(f). That paragraph requires proof of four elements: (1) the child must be at least four years old; (2) the child must have been adjudicated CINA; (3) the child must have been removed from the home for at least twelve of the last eighteen months, or for the last twelve consecutive months with any period at home being less than thirty days; and (4) the child cannot be returned home as provided in section 232.102 at the present time. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (interpreting statutory language "at the present time" as the time of the termination hearing).

In her petition on appeal, the mother contends L.J. could have been returned to her custody. But she did not express that certainty at the hearing. At the hearing, the mother asked for more time acknowledging "obviously she's not going to be able to come live with me today. If the therapist is recommending that visitations start—we haven't even started visitations."

On this record, we agree with the juvenile court's finding the mother has unresolved trauma and mental-health challenges that prevent reunification with L.J. She has failed to fully address her role in C.J.'s death or resolve "her pattern" of neglectful parenting.

The mother also argues the DHS failed to provide reasonable efforts to prevent the need for termination. Particularly, she points to the lack of visitation. Iowa Code section 232.102(9) requires the DHS to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (quoting Iowa Code section 232.102(7)); *See also* 2017 Iowa Acts ch. 54*,* § 31 (renumbering subsections of section 232.102). "The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *C.B., 611 N.W.2d at 493.*

The juvenile court rejected the mother's attempt to blame the DHS for not having the no-contact order modified to allow visitation with L.J. The court believed seeking modification was the mother's responsibility. The court noted, "She had two attorneys who could have assisted her in having the order modified but she made no effort to do so for almost an entire year." We reach the same conclusion as the juvenile court. The mother's criminal liability for C.J.'s death—and the associated no-contact order—prevented the DHS from scheduling visitation with L.J. The termination order listed the services provided to the mother. The DHS made reasonable efforts toward reunification consistent with L.J.'s best interests.

**B. Best Interests**

The mother next argues termination of parental rights is not in L.J.'s best interests. *See* Iowa Code § 232.116(2). She asserts: "The court put the child in limbo when it issued the termination order as there is no one in place to adopt this

child." She also warns if the child finds a permanent placement in Iowa, she "will likely not have regular contact" with her half-sister in Alabama.[4]

In making the best-interests determination, we give primary consideration to the child's safety, the best placement for furthering her long-term nurturing and growth, as well as her physical, mental, and emotional condition and needs. *Id.*; *P.L.*, 778 N.W.2d at 37. Safety and the need for a permanent home mark the "defining elements in a child's best interest." *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially).

Those defining elements figured prominently in the views of L.J.'s guardian ad litem (GAL), as expressed at the termination hearing. The GAL recognized "grief can be paralyzing" and the mother did suffer grief at the loss of C.J. But the GAL believed the mother's inability to be a safe parent was "a long-term pattern of hers." The GAL explained:

> It troubles me obviously greatly that we don't necessarily have a solid concurrent plan for [L.J.], and I know she loves her mother, and I know her mother loves her, but I just haven't seen the kind of changes in her behavior that would indicate that she could provide for the safety of [L.J.], . . . I do believe based upon [L.J.'s] need for permanency and stability and the inability of assurances that her mother can provide the care she needs, that would be in the best interest of this child to grant the State's relief request in the petition to terminate parental rights.

The GAL's opinion is persuasive. In determining best interests, we consider the parent's past performance, "because it may indicate the quality of care the parent is capable of providing in the future." *In re L.H.*, 904 N.W.2d 145, 149 (Iowa

---

[4] Our case law recognizes the value of sibling relationships. *See In re T.J.O.*, 527 N.W.2d 417, 420 (Iowa Ct. App.1994). But preserving the mother's parental rights to L.J. does not assure the sisters will be reunited.

2017). Like the GAL and the juvenile court, we find troubling the mother's pattern of neglectful parenting. Thus, we reject the mother's argument that termination of her parental rights is not in L.J.'s best interests.

## C. Countervailing Factor

As a final argument, the mother urges termination would be detrimental to L.J. because of the closeness of the parent-child relationship. *See* Iowa Code § 232.116(3)(c). She contends: "A person should not be denied the ability to parent her child because she lost another child and is still learning to heal from that incident."

Applying section 232.116(3)(c), we must decide if severing the legal relationship would be harmful to L.J. *See In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018) (holding burden to prove this permissive exception rests on the parent once the State satisfies the statutory ground for termination). There is no question L.J. was traumatized by losing contact with her mother. But that trauma arose from the mother's own actions, and their separation continued because of the mother's inaction in seeking to modify the no-contact order. The record does not show their relationship remained so close that L.J. will be disadvantaged by the termination or any detriment would outweigh the mother's inability to provide a safe home for her daughter. *See In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010).

**AFFIRMED.**