**IN THE COURT OF APPEALS OF IOWA**

No. 21-1781
Filed January 27, 2022

**IN THE INTEREST OF G.C. and R.C.,**
**Minor Children,**

**R.C., Mother,**
    Appellant,

**S.C., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Mahaska County, Rose Anne Mefford, District Associate Judge.

A mother and father separately appeal from the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Denise M. Gonyea of McKelvie Law Office, Grinnell, for appellant mother.

Lynnette M. Lindgren of Faulkner, Broerman & Lindgren, Oskaloosa, for appellant father.

Thomas J. Miller, Attorney General and Toby J. Gordon, Assistant Attorney General, for appellee State.

Nicole Steddom of Heslinga, Dixon & Hite, Oskaloosa, attorney and guardian ad litem for minor children.

Considered by Greer, P.J., and Schumacher and Ahlers, JJ.

**GREER, Judge.**

Under Iowa Code section 232.116(1)(h) (2021), the juvenile court terminated both the mother's and father's parental rights to two children, G.C. and R.C. Both parents separately appeal. The father argues that the State did not make reasonable efforts to reunify him and the children because of delays before he was allowed visitation while incarcerated. The mother argues that termination of her parental rights is not in the children's best interests and asks for a six-month extension. We find the father has not preserved error as to his challenge. As the mother has not preserved error to request a six-month extension and termination of the mother's parental rights is in the best interests of the children, we affirm the termination of each parent's rights.

**Facts and Proceedings.**

S.C., father, and R.H.C., mother, are married and together had two children, G.C. and R.C., who were one and two years old respectively at the time of termination hearing. The mother also had an older child, K.H., who regularly stayed with her and S.C. Beginning in September 2020, S.C. repeatedly sexually abused his step-child when the mother left them alone together. The child told her mother of the abuse, and S.C. admitted he touched K.H. inappropriately. Still, the mother did not report the information and continued to leave all three children alone with S.C., allowing for continued abuse of K.H. It was not until weeks after the child's initial report to the mother that K.H. told another family member and the Iowa Department of Human Services (DHS) was made aware of the allegations. DHS implemented a safety plan requiring that K.H. would not have contact with either the mother or S.C. and that the mother would not allow her younger children

to have contact with their father either. But, the mother violated the safety plan and allowed the father to come into the home with the younger children present. The father eventually confessed his abuse to police officers and was arrested and charged with second-degree sexual abuse.

G.C. and R.C. were removed from their parents' care in January 2021 and adjudicated children in need of assistance (CINA) that March. They were originally placed with their maternal grandmother, but they were removed when allegations of sexual abuse by their grandmother's paramour against K.H. surfaced. In April, both children were placed with a distant paternal cousin. Shortly after, they were diagnosed with failure to thrive and were found to be significantly underweight—G.C. required hospitalization.[1] G.C., then seven months, required hospitalization as she weighed ten pounds and was unable to hold her own head up, roll over, or crawl. With like concerns, R.C., then two years old, weighed twenty pounds, was unable to walk without falling over, had speech delays, and was unable to use silverware or feed herself properly. They both require extensive physical therapy, occupational therapy, and medical appointments. Medical protocol requires that R.C.'s weight is checked every two weeks and G.C.'s is checked weekly. G.C.'s malnourishment also led to potentially long-term issues with her hearing in one ear. At the time of the termination hearing, the children were both in the hospital because of their low weight and failure to thrive.[2] The mother did not attend the

---

[1] It is unclear from the record why the situation was allowed to get this drastic—reports from previous placements reflect the children going to the doctors with some concern about their weight but with no sense of urgency reflected.
[2] A letter from the children's doctor states he is unsure if this was related to malnourishment from their time in the mother and father's care, the current foster

appointments nor visit the children during either hospital stay as she does not have a driver's license or personal transportation. Amidst these challenges, the children have strongly bonded with the paternal cousin caretaker, who is willing to adopt them.

At the time of the termination hearing, the mother was having weekly, supervised visitation for two-hours in a public place. Visits could not happen in the mother's own home as she and a boyfriend were living with the maternal grandmother, whose paramour[3] was over quite often. Providers reported that the home also had a bug and flea infestation. When all three children were present at visits, the mother would care for one and leave K.H. or a provider to care for the other. Testimony at trial relayed the mother often remained in her chair rather than getting up to interact with the children, and she seemed to ignore the children when providers stepped away. When providers were present, they had to repeatedly redirect or assist the mother. And, despite the necessity of a strict eating plan for the children's health, the mother did not seem to understand the importance of following it. The paternal cousin provided all wipes, diapers, and bottles for visits. Even more, the paternal cousin testified at the termination hearing that, after visits, R.C. would come home quiet and distant. G.C. would cry and throw up, potentially because she was not being fed according to the eating plan or because she was not being burped frequently enough.

---

placement, an unknown underlying medical condition, or a combination of the three.

[3] This was the same person earlier accused of sexually abusing K.H.

When the father was originally arrested and the children were removed from his care, the jail was not allowing any visits because of the COVID-19 pandemic. Phone calls were also not a practical option because of the children's young age. He was approved for visits by the jail in late April 2021 and had his first interaction with the children at the jail in May. These interactions still had to happen over a phone with a glass barrier between him and the children, who could only remain attentive for short periods of time. Because of this, visits typically lasted less than thirty minutes. No inappropriate behavior was reported towards the children under this limited contact. At the time of termination, the father was still in jail awaiting trial.

In April, during the CINA proceedings, the father was ordered to undergo both a psychosexual and mental-health evaluation. He completed the mental-health evaluation but has been unable to follow the recommendations because of his incarceration. He has not completed the psychosexual evaluation.

In the same court order, the mother was recommended to have a mental-health evaluation and full psychological evaluation with a parenting assessment. She completed the mental-health evaluation but has not consistently attended therapy. After much cajoling and reminders by providers, the mother scheduled her psychological evaluation in September but will not be seen until January 2022. Testimony and provider reports show that the mother struggled to make and keep appointments, including visitation and parenting services. The mother and father are still married, but the mother contends she filed or plans to file for divorce.

After considering this history, the juvenile court terminated the parental rights of both the mother and father in November 2021 under Iowa Code section 232.116(1)(h).[4]  Both timely appealed.

**Discussion.**

Typically, our review of a termination of parental rights is a three-step process that begins with evaluating if a statutory ground for termination exists, moves to considering the children's best interests, and concludes with consideration of the exceptions found in Iowa Code section 232.116(3).  *See In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010).  We review the termination de novo, but we address only the steps raised by the parents on appeal.  *See id.* at 39–40.  To start, we consider the father's appeal.

**A. The Father.**

As the father remained in jail at the time of the termination hearing, he does not challenge the grounds for termination, but instead contends the State did not make reasonable efforts towards reunification because he was not given visitation until later in the case.  *See In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (requiring the State to show reasonable efforts were made to return the child to the parent's

---

[4] Section 232.116(1)(h) allows for termination when the juvenile court finds all of the following:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

care when terminating under section 232.116(1)(h)).  But other than now claiming that efforts were not made, the parent has a responsibility to object when appropriate changes can be made.  *Id.* at 839–40.  "In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding."  *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002).  The father asserts he asked for visitation at both the March CINA adjudication hearing and April dispositional hearing, but there is no mention of this request in the record provided[5] or even at the termination hearing.  While there are general requests for visitation mentioned in family team meeting and provider notes, "voicing complaints regarding the adequacy of services to a social worker is not sufficient.  A parent must inform the juvenile court of such challenge."  *Id.*  As the record is devoid of a request by the father to the juvenile court for any additional services or concerns about how services are being provided, error has not been preserved.  *See In re T.S.*, 868 N.W.2d 425, 442 (Iowa Ct. App. 2015) ("[W]e will not review a reasonable efforts claim unless it is raised prior to the termination hearing.").

Even if error had been preserved, "[w]hether visitation for an incarcerated parent should be ordered as a reasonable effort toward reunification when timely raised by the parent will depend on the circumstances of each case."  *L.M.*, 904

---

[5] The father did not order a transcript of either the March or April hearing.  *See* Iowa R. App. P. 6.803(1) ("Within seven days after filing the notice of appeal, the appellant must use the combined certificate to order in writing from the court reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary for inclusion in the record."); *see also In re F.W.S.*, 698 N.W.2d 134, 135 (Iowa 2005) ("It is the appellant's duty to provide a record on appeal affirmatively disclosing the alleged error relied upon.").

N.W.2d at 840 n.9. Visitation between the father and the children was left to the discretion of DHS and the guardian ad litem.[6] Testimony at trial confirmed that visitation was not possible at first because of COVID-19 protocols and phone visits were impractical because the children were so young and largely non-verbal. *See In re S.P*, No. 21-0928, 2021 WL 4304241, at *2 (Iowa Ct. App. Sept. 22, 2021) (explaining a delay in extended visitation because of COVID-19 protocols); *In re C.G.*, No. 20-1102, 2020 WL 7021684, at *2 (Iowa Ct. App. Nov. 30, 2020) (allowing a change in visitation because of COVID-19). The circumstances of the family and the larger world caused a delay in visitation, not any shortcoming on the part of DHS. And, visitation occurred in a format the father's self-inflicted circumstances allowed. As such, the father's argument that reasonable efforts towards reunification were not made would also fail on the merits. We next tackle the mother's claims on appeal.

**B. The Mother.**

The mother challenges only the second step, stating termination is not in the best interests of the children. We disagree.

Iowa Code section 232.116(2) states:

> In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child. This consideration may include any of the following:
> . . . .
> b. For a child who has been placed in foster family care by a court or has been voluntarily placed in foster family care by a parent

---

[6] Ultimately, the father visited with the children on a weekly basis for the allotted jail visitation time. Visitations were briefly put on hold while he was moved to another facility for evaluation, but they began again when he returned.

or by another person, whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and willing to permanently integrate the child into the foster family. In considering integration into a foster family, the court shall review the following:

(1) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining that environment and continuity for the child.

(2) The reasonable preference of the child, if the court determines that the child has sufficient capacity to express a reasonable preference.

The children's continued health and growth requires considerable medical care and consistent attendance at various appointments, an ability the mother has not shown for herself or for her children. What is more, the mother does not grasp the importance of following medical plans to keep her children at a healthy weight. Even in a supervised setting, she has not demonstrated she is capable of managing both children on her own and consistently relied on the older daughter or a care provider to share in the caretaking tasks. The mother did not exhibit a protective capacity, as she allowed both children to be with the father even after he admitted to her that he sexually abused another child in the home and violated the safety plan after the State became involved. And at the termination hearing, she lived in a home frequented by her mother's paramour, who allegedly sexually abused her older child.

The children bonded with the paternal cousin in the six months they were in her care leading up to the termination hearing. It is a pre-adoptive home, and the cousin has displayed an ability to care for these children and provide for their needs. On a positive note, the paternal cousin managed the extensive medical and therapeutic appointments for the children and made substantial progress on her foster-parent certification classes.

The children deserve permanency that the mother is not ready to give them, and they cannot be expected to wait. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) ("We do not 'gamble with the children's future' by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (citation omitted)). Simply put, the children's safety, future placement, and overall conditions and needs all indicate that termination of the mother's parental rights is in their best interests.

Finally, the mother also asserts that the children's best interests would be served by allowing her time to complete the psychological parenting assessment she scheduled for January 2022, arguing the results would provide better insight into her ability care for the children. She asks for a six-month extension[7] to have this done and begin training to become a parent capable of caring for these children. But, she did not request this extension at the termination hearing. As such, error has not been preserved, and we do not address the issue. *See In re T.J.O.*, 527 N.W.2d 417, 420 (Iowa Ct. App. 1994) ("As a general rule, an issue not presented in the juvenile court may not be raised for the first time on appeal.").

**Conclusion.**

With the health concerns involved here, we agree with the juvenile court's urgency to allow these children a home with a caretaker engaged in their well-being. Thus, because error was not preserved as to the father's challenge of

---

[7] Iowa Code section 232.104(2)(b) states, "An order [granting a six-month extension] shall enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period."

reasonable efforts, the mother did not preserve error to ask for a six-month extension, and termination of the mother's parental rights is in the best interests of the children, we uphold the juvenile court's order terminating the parental rights of the mother and father.

**AFFIRMED ON BOTH APPEALS.**