**In the Interest of A.T. and A.D., Minor Children,**

**J.T.-M., Mother, Appellant.**

No. 11–0158.

Court of Appeals of Iowa.

April 27, 2011.

Alyssa Kenville of Alyssa Kenville, P.C., Fort Dodge, for appellant mother.

Dani Eisentrager, Eagle Grove, for father of A.T.

Christopher O'Brien, Fort Dodge, for father of A.D.

Thomas J. Miller, Attorney General, Bruce Kempkes and Kathrine Miller-Todd, Assistant Attorneys General, Ricki Osborn, County Attorney, and Laura Barnaby and Jordan Brackey, Assistant County Attorneys, for appellee State.

Jonathan Beaty, Fort Dodge, for minor children.

Considered by VAITHESWARAN, P.J., and EISENHAUER and DANILSON, JJ.

DANILSON, J.

A mother appeals the permanency order placing A.T., with A.T.'s father. She also appeals an order pertaining to A.D. that denied her request for a permanency order placing A.D. with her. She argues the juvenile court erred in shifting the burden of proof to her to prove that the children should be returned to her care, and in finding the evidence warranted placing the children with their fathers. Because we conclude the juvenile court was not authorized to enter a permanency order in A.T.'s case, we reverse. We affirm in A.D.'s case, as the court was also not authorized to grant the relief sought by the mother.

## I. Background Facts and Proceedings.

The mother has three children, all with different fathers. Six-year-old A.T. and four-year-old A.D. are the subjects of this appeal. Fifteen-year-old T.M. lives with his father in accordance with his expressed desire not to have any further relationship with the mother.[1] This family originally came to the attention of the Iowa Department of Human Services in April 2001 through January 2003, as a result of the mother's substance abuse (methamphetamine) and mental health issues. Services were again initiated in April 2005, due to the same issues. The children were adjudicated children in need of assistance (CINA) and were removed, but were eventually returned to her care. During this time, the mother admitted to using methamphetamine as many as four to five times per week. She began wearing a drug patch and seeing a therapist for her de-

pression and anxiety issues. Although the mother suffered several relapses and it was a "daily struggle" for her to stay clean, she eventually "appeared to be maintaining sobriety" and the CINA cases were closed in May 2008.

Several weeks later, the mother again began using methamphetamine. Kevin, the mother's paramour (and father of A.D.), also admitted using methamphetamine. It was also alleged that the mother had left one-year-old A.D. unsupervised at home while Kevin was at work. The children were again adjudicated CINA. The juvenile court entered an order placing custody of the children with DHS, and the mother and Kevin agreed to their placement with the maternal grandparents.

The mother and Kevin cooperated with the case plan, completed substance abuse evaluations and outpatient substance abuse treatment, and provided clean drug screens. On November 27, 2008, the children were returned home on an extended trial home placement. The trial placement "went well," and on March 10, 2009, the juvenile court returned custody of the children to the mother, with the understanding that the children would reside with both Kevin and the mother in the family home.

In July 2009, the mother suffered a relapse and admitted to using methamphetamine. A safety plan was established, and the children were not removed. However, the mother did not comply with the safety plan or cooperate with DHS, left the family home, and failed to complete drug testing or treatment. The court entered an emergency ex parte removal order for the children on August 11, 2009. This was the fourth time the children were removed

---

1. The juvenile court previously entered an order placing T.M. permanently with his father, which the mother does not appeal.

from the mother's care as a result of her relapses to methamphetamine, and they have not returned to the mother's care since. About this same time, the mother was on probation for conspiracy to manufacture methamphetamine.[2]

A disposition review hearing was held on September 15, 2009. Kevin had stopped living with the mother by that time. All parties stipulated to placement of A.T. with her father (Jon) and A.D. with his father (Kevin).[3] The children have remained in those respective placements.

In August 2010, pursuant to a stipulation after a joint request for a grant of concurrent jurisdiction, the district court issued a dissolution decree placing primary physical care of A.T. with Jon. In regard to A.D., although the juvenile court authorized concurrent jurisdiction for the mother and Kevin, "neither of them has taken advantage of the opportunity," and as a result, there is no district court order establishing custody of A.D. between them.

On January 18, 2011, a combination permanency/review/modification hearing was held in A.T.'s and A.D.'s cases. The mother requested the juvenile court enter an order placing both A.T. and A.D. permanently in her custody. The mother testified she had met all terms of the contract of expectations and stated she had been clean since September 2009 and had completed substance abuse treatment. She further testified that she is employed full-time and is living with her paramour (also a recovering drug addict) in a large and clean home that would be appropriate for the children. However, the mother also

admitted she had not attended NA/AA meetings and she had not taken full advantage of visitation with the children.[4]

The State presented to the court a DHS report authored by caseworker Misty McKinney. The report acknowledged the mother "appears to be doing well with her sobriety and stabilizing her life for the past year, but DHS is concerned [the mother] has had a long history of illegal substance abuse." The report noted that the children have been removed four separate times. The DHS report recommended that "permanency for each child be placed with their respective fathers." However, at the outset of the hearing, the State recommended A.T.'s case be closed unless placement was granted to the mother. The State did not present any additional evidence at the hearing.

The juvenile court entered a permanency order on February 11, 2011, placing custody of A.D. with his father. The court determined "it is in the best interests of the child to remain in the custody of the father under the protective supervision of DHS." The court also reaffirmed its grant of concurrent jurisdiction to allow the parties to litigate the issues of custody, visitation, and support as to A.D. in the district court. A.T.'s case was closed. The mother now appeals.

## II. Scope and Standard of Review.

Our review of permanency orders is de novo. *In re A.A.G.*, 708 N.W.2d 85, 90 (Iowa Ct.App.2005). We review both the facts and the law and adjudicate rights

---

2. She violated the terms of her probation, and she served thirty-six days in jail.

3. The mother also stipulated to T.M.'s placement with Kevin, pending a home study on T.M.'s father, who lived in North Carolina. T.M. was subsequently permanently placed with his father.

4. The mother was allowed one weeknight visit per week with the children, but testified that she cancelled every other week of these visits because "[i]t's a three-hour drive for a two-hour visit." The mother did maintain her visits with the children every other weekend.

anew on the issues properly presented. *In re K.C.*, 660 N.W.2d 29, 32 (Iowa 2003). We give weight to the juvenile court's findings, but are not bound by them. *Id.* Our paramount concern is the child's best interests. *Id.*

## III. Merits.

■ *A. Permanency of A.D.* The State must prove by convincing evidence that the child cannot be returned to the child's home. Iowa Code § 232.104(3) (2009). The mother contends the juvenile court erred in shifting the burden of proof to her to prove that the children should be returned to her care. She contends the court "improperly took the position in the permanency orders that the mother was under a burden to prove that a removal from the father's care would be in the best interests of the children." The mother further alleges the evidence does not support placement of A.D. with the father.[5]

The mother's argument ignores the fact that, with the exception of a few months, A.D.'s home has always been with his father, Kevin.[6] DHS caseworker McKinney's report to the court dated December 29, 2010, states, "I am unclear why reunification with the mother is the plan for A.D. when he never left the care of his father." The State contends the juvenile court placed A.D.'s permanency in the proper context. The record reflects, and the mother acknowledged at the hearing, that

A.D. was residing with both her and the father at the time of the initial removal.

The juvenile court observed:

[T]he mother may believe that prior Court orders have made her rights to A.D. superior to Kevin's rights. A review of those orders and the context in which they were entered shows that the mother is incorrect. The evidence shows that A.D. lived with both Kevin and the mother from the time of his birth until he was voluntarily placed out of the home along with his siblings with the maternal grandparents on or about July 1, 2008. Reunification efforts were made with the parents and when an extended trial home visit began in November of 2008, the visit was both Kevin and the mother. The confusion might arise because of the Court's Modification Order of March 10, 2009, and Temporary Removal Order of August 11, 2009. The March 10, 2009 Order returned custody of all three children, T.M., A.T., and A.D., to the mother for placement in her home under the protective supervision of DHS. Only the mother was granted custody even though Kevin was still residing in the home. It is clear to the Court that the Order was issued in that way because the mother is the common denominator. That is, she is the biological mother of all three children, but each of them has a separate father. One of the DHS goals was to keep the siblings together, if at all possible, and

5. The mother also argues that "[t]o the extent that any issue was not properly raised at trial or preserved for appeal, the mother asserts a claim of ineffective assistance of counsel." Without showing a deficiency in counsel's performance that resulted in actual prejudice, we find this argument fails. *In re T.P.*, 757 N.W.2d 267, 274 (Iowa Ct.App.2008). We find the mother's remaining arguments were properly preserved.

6. The mother raises an argument distinguishing between the court's permanency order

pursuant to Iowa Code section 232.104(2)(a), as opposed to section 232.104(2)(d)(2). Upon our de novo review, we find the court's order under section 232.104(2)(a) is proper under these circumstances. As the court observed:

A review of the permanency statute, 232.104(2) shows that it is written in a descending order of preferences. The first section, 232.104(2)(a) is, obviously, the preferred choice, to return the child home.

placement of the custody of all three children with the Mother accomplished that goal. Now, that goal has been frustrated because T.M. and A.T. have been placed permanently with their fathers. Custody of the children was then removed from the mother because of her relapse. Subsequently, reasonable efforts were made to reunify the children with the mother and concurrent plans for permanent placement with the father, as a single parent only, were made. The Court acknowledges all of this. However, it is clear that Kevin was a part of A.D.'s family unit at all material times every bit as much as the mother. The goal in Juvenile Court is to keep the child in the child's home. The Court did not intend its [previous orders] to be considered a selection of a custodial parent as between these two unwed parents.

It must be remembered that this is not a District Court lawsuit for custody, visitation, and support between two parents. Rather, this is a Child in Need of Assistance case involving the best interests of the child. A review of the Juvenile Code shows that the focus is not about the custodial rights of either parent. Rather, the focus is keeping the child in his home. The Court must make a contrary to welfare finding before a child may be removed from his home. If removal occurs, reasonable efforts must be provided to return the child to his home. Once a child is returned to his home, reasonable efforts must be provided to maintain the child in his home until the case is closed. From A.D.'s perspective, his home has been with his father for his entire life. Except for a few months in the summer and fall of 2008 when he lived with his maternal grandparents, A.D. has always lived with his father. The mother has been in and out of A.D.'s home. She was in that home from the time of A.D.'s birth until the placement with the grandparents during the summer and fall of 2008. She was in A.D.'s home again from November 2008 until her relapse in July of 2009. The mother has been out of A.D.'s home ever since then. From A.D.'s view point, placing him with the mother does not return him home. Rather, it removes him from the home he has known for virtually all of his life. The Court finds that it would be in the best interest of A.D. to keep him permanently in what he considers to be his home, which means placement in the custody of his father.

The mother and Kevin have *both* participated in many reunification services over the course of several years. Kevin's participation has been consistent and positive, and he has provided a stable home for A.D. throughout the majority of his life. Until very recently, the mother's erratic and unstable behaviors have caused her to be in and out of A.D.'s life. Even now, she does not exercise visitation with A.D. to the full extent she is allowed.

A critical point in these proceedings occurred in the fall of 2009 when the court determined the best placement for A.D. was with Kevin. At that time, the mother had relapsed once again and left the family home. Kevin and the mother have not lived together since then, and A.D. has remained with Kevin. Significantly, A.D. believes his home is with his father. DHS has made reasonable efforts to support this placement, and it is in A.D.'s best interests to remain in his father's care.

The mother should be commended for the improvements she has made to her life, including being employed and maintaining a clean and safe home. A.D. enjoys his visits with her. A.D. is fortunate to have two parents that love, care, and provide for

him, and the ability to maintain relationships with each parent.

The mother urges us to reverse on the basis that the State never met its burden of proof. In that regard, she contends that there was no evidence to refute her success and little evidence for the court to judge the father's progress. We agree that at the initial permanency hearing, before a permanency order may be entered, the burden is on the State to show that all of the following apply: (a) a termination of the parent-child relationship would not be in best interests of the child; (b) services were offered to the child's family to correct the situation that led to the child's removal from the home; and (c) the child cannot be returned to the child's home. Iowa Code § 232.104(3) (2009).

The difficulty here is that A.D. was not in an out-of-home placement at the time of the initial permanency hearing. Rather, A.D. had been previously placed with her father, and A.D.'s father was a parent with both physical care and custody at the time of removal as well as when the CINA petition was filed.

These facts are distinguishable from the scenario where the court is authorized to transfer custody of a child from a custodial parent to a noncustodial parent. See Iowa Code § 232.104(2)(d)(2). The initial permanency order attempted to authorize permanent placement with the father as between two custodial parents. Here, the child had two homes. See In re S.V., 395 N.W.2d 666, 670 (Iowa.Ct.App.1986) (recognizing a child may have two homes). Because the child had already been returned to the home of a parent who had physical care at the time of removal, the State failed to meet its burden to establish by convincing evidence that the child could not be returned to the child's home as the child was already returned "home." Thus,

under these circumstances, a permanency order was not authorized.

We observe, however, that the hearing held was described as a "permanency/review/modification hearing." The juvenile court, by its order, reaffirmed its prior grant of concurrent jurisdiction to the district court to allow the mother and Kevin to litigate the issues of custody, visitation, and support. Such an order is appropriate when both parents are suitable caregivers, but the juvenile court is not yet able to terminate the proceedings because the purposes of the dispositional order have not been accomplished and the child still needs supervision, care, or treatment. See Iowa Code § 232.3, 232.103(4). Concurrent jurisdiction permits the parents to determine their rights *inter se,* or among themselves. *In re A.B.,* 569 N.W.2d 103, 105 (Iowa 1997). The juvenile court's discretion must be exercised in the best interests of the child. *In re R.G.,* 450 N.W.2d 823, 825 (Iowa 1990). Accordingly, our reversal is limited only to the portion of the order filed January 19, 2011, that attempts to fix permanency. Placement of A.D. shall remain as provided by the dispositional order or if modified, the last modification of the dispositional order.

### B. Order Closing A.T.'s Case.

Unlike A.D.'s case, no permanency order was entered in A.T.'s case. In fact, the case was closed terminating all proceedings. The mother's appeal of the order contends the court should have entered a permanency order granting her placement of the child. However, the court was without authority to enter such an order for similar reasons explained in reference to A.D.'s case.

We first acknowledge that in A.T.'s case, the child's removal was from the mother's home. The mother and father were married, but were separated. However, in a

prior order, the juvenile court accepted the parties' request to litigate concurrently the placement and custody of A.T. in the district court upon finding that concurrent litigation was in the best interests of A.T. As previously noted, section 232.3(2) allows the juvenile court "the legal discretion to authorize a party to litigate concurrently a specific issue relating to custody, guardianship, or placement of a child who is the subject of a pending juvenile action." *R.G.*, 450 N.W.2d at 825. The decree dissolving the marriage between the mother and A.T.'s father, Jon, was entered in the district court on August 18, 2010, and placed custody of A.T. with Jon, pursuant to the parties' stipulation.

Accordingly, at the time of the permanency hearing, Jon was the physical caretaker of A.T. Although the mother was the parent with physical care at the time of the removal and was entitled to seek to be reunited with A.T., she was no longer entitled to physical care by the terms of the dissolution decree.

█ We acknowledge that at the permanency hearing she could have argued that the court should transfer sole custody from the parent with physical care, Jon, to a parent without physical care, herself, pursuant to Iowa Code section 232.104(2)(d)(2). However, we conclude that once the district court fixed physical care as between the mother and the father, and the child was placed in the home of the physical caretaker, the State could not meet its burden to show the child "cannot be returned to the child's home" as required by section 232.104(3)(c), because by the terms of the dissolution decree, A.T. was already "home." Thus the relief sought by the mother at the hearing, and this appeal, is not available to her.

## IV. Conclusion.

Upon our review of the record and the legal arguments submitted, we affirm the order closing A.T.'s case, and reverse the order entered in A.D.'s case filed January 19, 2011, to the extent that it fixes permanency.

**AFFIRMED IN PART; REVERSED IN PART.**