# IN THE COURT OF APPEALS OF IOWA

No. 15-1216
Filed October 14, 2015

**IN THE INTEREST OF A.G. AND B.B.,**
**Minor Children,**

**M.B., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Scott County, Cheryl E. Traum, District Associate Judge.

The mother of children adjudicated in need of assistance appeals from a permanency review order changing the reunification goal from reunification with her to reunification with the children's fathers. **REVERSED AND REMANDED.**

Gary McKenrick of Cartee & McKenrick, P.C., Davenport, for appellant mother.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Michael J. Walton, County Attorney, and Julie Walton, Assistant County Attorney, for appellee State.

Carrie Coyle, Davenport attorney for appellee father.

Christine Frederick of Zamora, Taylor, Woods & Frederick, Davenport, for appellee father.

Randall McNaughton, Davenport, attorney and guardian ad litem for minor child.

Joshua Cobie of Brubaker, Flynn & Darland, P.C., Davenport, attorney and guardian ad litem for minor child.

Considered by Doyle, P.J., and Mullins and Bower, JJ.

**DOYLE, Presiding Judge.**

The mother of two children appeals from a juvenile court's second permanency order denying her request for additional time and altering the permanency goal, among other things. She contends the juvenile court should have given her at least three months to utilize services and argues transferring custody and changing the permanency goal is not in the best interest of the children. Because we agree, we reverse and remand for further proceedings.

### I. *Background Facts and Proceedings.*

M.B. is the mother of B.T., born in 2002, and A.B.-G., born in 2007. J.T. is the father of B.T., and R.G. is the father of A.B.-G.

The children came to the attention of the Iowa Department of Human Services (DHS) in April 2013, after it was reported the mother had exposed the children to cocaine. Each child's hair-stat test subsequently tested positive for cocaine. The mother admitted she had a long history of substance abuse and had been addicted to cocaine for approximately eleven years. In that time, the mother had been in and out of treatment. Just prior to DHS involvement, the mother had been in an inpatient-substance-abuse-treatment program, but she left the program in February 2013 and relapsed thereafter.

DHS began a voluntary case, and it began offering the mother services in May 2013. Although the mother was generally cooperative with DHS, she relapsed. While the children's November 2013 hair-stat test results were negative for illegal drugs, the mother's sweat-patch tests tested positive for cocaine on samples collected on November 27, 2013, December 3, 2013, and

January 23 and 30, 2014.[1]  Nevertheless, despite her relapses, the children remained in the mother's care until February 2014, when they were voluntarily placed with the mother's parents (children's grandparents).

The mother again tested positive for cocaine on sweat-patch tests collected March 31, 2014, and April 18 and 19, 2014.  DHS then sought court involvement, and the State on May 14, 2014, filed its petition asserting the children were children in need of assistance (CINA).  Following a contested hearing, the children were adjudicated CINA in August 2014.  The juvenile court did not believe the mother's claims that the sweat-patch test results were false positives.  Additionally, the court was concerned the mother's paramour, D.J.D., with whom the mother lived, used marijuana, noting that "[n]ot only is illegal substance abuse in a home where the children would reside a problem, but living with a substance abuse [user] would create a negative environment for someone trying to beat a lengthy abuse habit."  The court agreed with DHS that the children's placement with their grandparents could not continue because the grandparents allowed the mother unsupervised contact with the children.  However, the court noted the children's guardian ad litem (GAL) and DHS both believed keeping the siblings together was in the children's best interests.  Because one of the children's fathers, R.G., agreed to have both children placed with him and DHS determined his home was safe and drug-free, the court transferred placement of the children from their grandparents to R.G.

---

[1] A hair-stat test performed on the mother's hair sample collected February 11, 2014, tested positive for cocaine, but a urine sample collected the same day was negative for cocaine, seeming to indicate her use was in line with the mother's positive tests at the end of January 2014.

Services continued to be offered to the mother, and an uncontested dispositional hearing was held October 8, 2014. At or just prior to the dispositional hearing, the State entered several exhibits, including the social history report prepared by DHS. The report stated:

> [The mother] has a long history of substance abuse . . . . [The mother] drinks alcohol and until recently, professed her belief this is okay, because she does not have a problem with alcohol.
> On 09/12/2014, [the mother] acknowledged drinking "one shot," a week and a half ago (referring to weekend of 9/5/2014), while out with girlfriends. [The mother] said she learned . . . that drinking alcohol is "Probably not a good idea" and is having a hard time accepting it. She shared that she does not want to accept this, because it's just one more thing she can't do.
> On 9/2/2014, [the mother] informed [the treatment center] that she "relapsed." Due to her multiple treatments [the treatment center] does not believe [the mother] needs to return to treatment at this time. However, she does need to attend aftercare weekly; as well as meetings and work with a sponsor on step-work.
> Prior to September 2014, [the mother] had consistently claimed she has been sober since the first part of November 2014 [sic]; despite several positive drug tests for cocaine. The mother [and her paramour] most recently tested positive for drugs on 08/20/2014. [The mother] said she did two lines of cocaine with [her paramour], when she found out the children were adjudicated CINA. She also admitted to using marijuana around the time of the first of the two adjudicatory hearings (07/09/2014). . . . [The mother] now identifies her sober date as 08/20/2014; despite admitting to drinking alcohol on or about 09/06/2014.

The court's dispositional order entered thereafter stated:

> Since the adjudication hearing, the mother and her paramour have tested positive for illegal substances. The mother also admitted to drinking alcohol, believing that it was not an issue as it was not an illegal drug. The mother has since been accepted into Family Wellness Court. The mother needs to fully participate in Family Wellness Court and not associate with individuals that use illegal substances. Another concern from [DHS] is that the mother is having adult conversations with [her oldest child], and that she is attempting to sabotage the placement. The mother needs to examine her interactions with [that child] and make the children a priority in her life.

The court's order did not indicate the dates of the mother's "positive" tests.

A few days prior to the scheduled January 21, 2015 permanency hearing, an attorney was appointed to represent the children's interests. Additionally, DHS, the children's GAL, and the court-appointed-special advocate (CASA) filed reports in the matter. DHS's report stated the mother's drug tests had been negative with the following four exceptions:

> 09/30/2014 - Positive for amphetamines not consistent with prescribed medication. [Creatinine] level: 88.3.
> 10/06/2014 - Positive for amphetamines not consistent with prescribed medication. Positive for benzodiazepines which could be consistent with prescribed [m]edication. [Creatinine] level: 102.8.
> 10/30/2014 - Positive for benzodiazepines which could be consistent with prescribed [m]edication. [Creatinine] level: 119.5.
> 12/31/2014 - Positive for alcohol. [Creatinine] level: 131.1.

However, the mother had similar tests before and after these dates with findings of the same levels of amphetamines and benzodiazepines that were determined to be consistent with medication the mother was taking and did not result in positive-test results. In any event, none of these tests were positive for cocaine. Concerning the creatinine level, DHS's report stated that

> normally hydrated individual's [creatinine] level will be around 100 mg/dL. When creatinine levels fall below 50 the test results can be affected. When somebody is below 50, it indicates they are overhydrated. Prevention would be to advise the individual to avoid (or at least limit) their fluid intake for 2-3 hours prior to providing the specimen. As long as the specific gravity is within normal limits the specimen is not considered dilute. Therefore, these results can be considered valid; although, it is fair to question them.

Despite the mother's "relapses," DHS recommended the court grant the mother an additional six months to continue to work toward reunification.

The GAL reported both children were doing well at R.G.'s home but both requested they be returned to the mother's care. The older child told the GAL he had saw improvements in his mother, the younger child's response was not as reasoned as the older child's response, but the GAL found that to be appropriate given the child's age. The GAL agreed with DHS's recommendations and believed the mother should have additional time to resolve her drug addiction issues.

The CASA reported she was concerned with the mother's long history of substance abuse, but she ultimately recommended a review hearing be held in three months, with the mother continuing to "aggressively address her substance abuse," among other things. The CASA also recommended the mother's visits be increased in frequency and with less supervision.

The permanency hearing was then held on January 21, 2015. There, the court and others learned the mother tested positive for cocaine on January 18, 2015. The mother testified concerning her relapse, stating her paramour had played a part in her relapse and had been abusive. Despite this setback, the parties' recommendations seemed to be unchanged.

Following the hearing, the court entered its permanency order noting the mother had recently relapsed on cocaine and had "come to the realization that her paramour . . . [was] not a positive influence in her life" because he continued "to abuse substances" and did "not support her sobriety." The court also noted the parties' recommendations that the mother be given six additional months, and, "[b]ased on the progress being made by the parents," it anticipated "the children may be returned to parental custody and control within six months.

Specifically, the mother is involved in substance abuse treatment, Family Wellness Court, and mental health treatment." However, the court set the matter for hearing in three months.

Prior to the May permanency hearing, DHS, the GAL, and the CASA again filed reports. The GAL and CASA's recommendations generally remained the same, recommending the mother be given another three months. However, DHS recommended the permanency goal be changed to reunification with the fathers. DHS reported the mother had missed two drug tests on March 15 and 16, 2014, counting those tests as positive tests, along with the other four "positive" tests it identified in its January 2015 report. The report explained:

> [The mother] has a long history of substance abuse and has been through treatment multiple times; only to return to abusing drugs.
>
> [The mother] intentionally withheld information and lied repeatedly to DHS regarding her relationship with [her paramour], whom she testified to as being domestically violent and claimed his drinking was a trigger to her drug relapse.
>
> As the Permanency Hearing has gotten closer, [the mother] appears to have been more motivated. [The mother] appears as if she may be beginning to let the treatments permeate her exterior. [The mother] is on the right path; however, has a long way to go in maintaining her sobriety and making the life changes necessary to safely parent her children. [DHS] believes [the mother] is capable of making these changes if she keeps up the work she is currently doing and at the pace at which she is currently working. DHS believes this will take several more months, if not a year(s).
>
> DHS believes the children cannot be safely returned to their mother's care at this time. [The mother] has made progress in the past three months. However, [the mother] has a very long history of addiction and a lot of contributing issues which need resolve [sic].
>
> The children are in need of permanency. They have been out of their [the mother's] care for nearly [fifteen] months and believe [the mother] is not safe option. Therefore, DHS recommends custody of the children be transferred to their fathers.

The permanency hearing began on May 5, 2015, but the matter was not completed that day, and the hearing recommenced June 3, 2015. As of the May hearing date, the mother had provided approximately twenty more urine samples for analysis since the January hearing, and none tested positive for cocaine. Though some tests indicated the presence of amphetamines and benzodiazepines, the results were not considered to be positives because the levels were consistent with the mother's prescription medications. Nevertheless, DHS questioned the validity of the mother's tests. The DHS caseworker testified:

> [A]lthough none of the drug testing since that January hearing has been positive for illegal drugs, I am very concerned with the low [creatinine] levels that are on them. I certainly cannot say that she is using. I certainly hope she hasn't. I hope they are very accurate. The problem is with how low those [creatinine] levels are, that concerns me about any attempts she may be making to dilute her system and the validity of the outcome of those. Because many of those don't even show her prescription meds when the [creatinine] levels are that low. It kind of zeros everything out.

However, the caseworker admitted that where the mother's tests' creatinine level was considered low, the specific gravity was tested and the samples were determined to be within the normal range. The caseworker agreed the tests "are considered to be valid," but she testified it was also "appropriate to have some concern or question about that. I forget exactly how that was worded." The caseworker testified the mother had only begun to make progress in the case recently, and the caseworker did "not believe that it [was] likely at all that in the next three months that [the mother would] make the progress necessary for the children to be returned to her care."

In addition to tests with a low creatinine level, the caseworker testified she questioned the mother's honesty, finding that the mother was at times

manipulative. Apparently the mother had continued to see her paramour, whom the mother had described as abusive and detrimental to her progress in January 2015. However, the caseworker admitted that since the January 2015 hearing, the mother had regularly attended all of her counseling sessions, along with weekly sessions with her provider at the Center for Alcohol & Drug Services, Inc. (CADS). The mother also regularly participated in family wellness court and completed its assignments, met with her case provider when requested to do so, and kept all of her visits with her children. The caseworker acknowledged that after missing her drug tests on March 15 and 16, the mother provided a urine sample on March 17 for an extended panel that would show her drug use up to the past seventy-two hours, and the results were negative for illegal substances. The caseworker testified the mother was properly managing her mental health as she had been directed. Despite all of these things, the caseworker believed the mother's continuing relationship with her paramour and lack of establishing new relationships demonstrated her lack of progress. The caseworker admitted she essentially refused to communicate with the mother and directed information pass between the service provider because she believed the mother was trying to manipulate the situation and "get different answers from different people." Another example of the mother's "manipulation" was the mother reporting the youngest child had told her about a fight between R.G. and his wife, testifying that "it wasn't that [the mother] shouldn't have been relaying that information . . . . The concern for me is maybe it was innocently reported by [the child] in the bathroom, but it fit a pattern of past behavior of [the mother]." The caseworker testified she did not believe the mother could "make the necessary changes to

demonstrate that the children would be able to be returned to her care in three months," but she admitted she was "probably the only one that shares the skepticism with regard to . . . the results." Similarly, the caseworker testified she did not think any specific harm would come to the children in giving the mother another three months, but she testified:

> [M]y position is these kids deserve permanency and I believe the [Iowa] Code indicates as well is it more likely than not that these kids would be able to return home in that time frame, and I don't believe that it's likely. I think [the youngest child] is probably—you know, she kind of goes with the flow and she's okay. [The oldest child], there is more going on there. And I think permanency is probably even more so important for him because he's the one who kind of keeps things bottled up and has a better understanding of what's going on and that type of thing. So harm, I would have to say none. Need for some permanency, I think there's a big need for him.

Conversely, the mother's service provider at CADS testified on behalf of the mother, and she believed the mother had "complied with everything that has been requested of her," including the requirement that she "find new playmates and new playgrounds." Concerning the mother's substance abuse, the CADS worker testified she believed the mother was addressing her substance abuse issue, explaining:

> Looking at the big picture and then looking at more recently. So within the past year, what have things looked like. Since she first entered at CADS, what have things looked like. She has had three incidents of use since she first began at CADS in September. So what is that, eight months? For somebody who has spent a good chunk of their life using, it's really hard to just cut it off and walk away. Most people can't do that.
>     . . . .
>     [The mother] has still used. She is not currently using. Currently she has not used in over three months. And she is a different person. She is working on changing her thought processes. And I have noticed a significant change in how her thought processes have changed. I've noticed that she has been

able to develop these coping skills, that she is able to understand what those triggers for relapse could potentially be and how she can counteract that.

The hearing recommenced almost a month later. The mother had three more urine tests that were negative for illegal substances. Another service provider testified she saw the mother with her paramour that week at a gas station. The service provider testified she did not talk to the mother or her paramour and did not know the situation, and she admitted the paramour was never present during any of the mother's visits with the children at the mother's home. The service provider testified that when she supervised the mother's visits with the children, there were "no major concerns." She testified that the restriction on communication between the mother and the DHS caseworker "incorporate[d] a lot of confusion. There was a lot of miscommunication on things, and I think that was openly communicated between myself and the DHS [caseworker]." Another service provider testified that although the mother loves and is bonded to the children, the provider also had concerns about the mother's parenting of the children "with the codependency and the ability—and we've talked about it—about being able to say, No, not just handing them over, not being a friend versus being a parent. Those are some of the things that we've talked about."

At the close of the hearing, the mother's attorney asked for at least two additional months to work toward reunification and that it require DHS "to set up specific goals that need to be met by [the mother] in order for her visitation to be advanced, because it hasn't been advanced." The children's attorney advised the court that both children wanted to be together and returned to the mother's

care. The children's GAL recommended additional time be given to the mother, stating he did "not see how it can injure the children who desperately want their mother to have as many chances as possible by giving it two more months." He believed the mother was "actively in recovery" and had taken "sort of a leadership role and helping her peers as much as she could" at wellness court.

Following the hearing, the juvenile court entered its order on June 29, 2015, changing the permanency goal from reunification of the mother and the children to reunification of the children with each child's father, and moving the oldest child from his placement with the younger child at her father's home to his own father's home. The court concluded:

> The mother struggles with being honest with the providers and the [DHS] worker. One issue has been her relationship with an individual [identified as her paramour]. Initially the mother insisted that her relationship with [her paramour] was positive. She then testified at a hearing in January of 2015, that [her paramour] had been physically abusive and that he was unsafe to be around. Despite her reports that they were no longer in a relationship, [the mother and her paramour] have been spotted together several times. Each time [the mother] has had an explanation such as [her paramour] came to her apartment to pick up his belongings or another time he came by to pick up bedding that was in her dryer or most recently that he ran out of gas and she needed to give him a ride. The mother does not admit to a continuing relationship with [her paramour], but when confronted she has admitted that he has spent the night at her house and that he still had a key to her residence. [Her paramour] is a [threat] to the mother's sobriety and to her physically. He is also a threat to the children.
> The mother has a very lengthy history of substance abuse. Earlier in the case inpatient substance abuse treatment was recommended however the mother did not wish to follow that recommendation. She has also chosen not to follow her therapist's recommended of a dual diagnosis program with a residential component. The mother has participated in wellness court, but has had setbacks. The court is also concerned with the mother missing therapy appointments. The children clearly love and miss their mother. However they deserve parents who can provide them a safe and stable home. The mother is not in a position to do that at

this time. The children have been out of her care for over a year and they deserve permanency.

The mother now appeals. Response briefs were thereafter filed by the State, each father, and the children. While the State and the fathers advocate the juvenile court's permanency order be affirmed, the children support reversal of the order.

## II. *Scope and Standards of Review.*

We review permanency orders de novo, sorting through both the facts and law and adjudicating rights anew on the issues properly presented on appeal. *In re A.T.*, 799 N.W.2d 148, 150-51 (Iowa Ct. App. 2011). We give weight to the factual findings of the juvenile court, but are not bound by them. *Id.*

## III. *Discussion.*

The parent-child relationship is constitutionally protected. *See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972); *State v. Iowa Dist. Ct.*, 828 N.W.2d 607, 615 (Iowa 2013); *In re K.L.C.*, 372 N.W.2d 223, 226 (Iowa 1985). Notwithstanding:

> The protection of children is one of the most well-established duties and public policies of the State of Iowa. The State has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it. Both DHS and the juvenile court have the important function of protecting children who are in need of assistance.

*In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014) (alterations, internal citations, and quotation marks omitted).

In light of these competing interests, the legislature has directed chapter 232 be "liberally construed to the end that each child under the jurisdiction of the court . . . receive, preferably in the child's own home, the care, guidance and

control that will best serve the child's welfare and the best interest of the state." Iowa Code § 232.1 (2015) (emphasis added); *see also A.M.*, 856 N.W.2d at 373. Thus, "[w]e afford a rebuttable presumption that the best interest of a child is served when custody is with the natural parents," *In re N.M.*, 491 N.W.2d 153, 156 (Iowa 1992), and "[w]henever possible the court should permit the child to remain at home." Iowa Code § 232.102(5)(a). Additionally, when children are removed from their home, DHS must "make every reasonable effort" to return them to their home as quickly as possible consistent with their best interests. Iowa Code § 232.102(7); *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). The reasonable efforts concept includes visitation designed to facilitate reunification while providing adequate protection for the children. *C.B.*, 611 N.W.2d at 493. "Visitation between a parent and child is an important ingredient to the goal of reunification." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). But the best interests of the child controls the nature and extent of visitation. *See id.*

During the permanency hearing, the juvenile court must

consider the child[ren]'s need for a secure and permanent placement in light of any permanency plan or evidence submitted to the court and the reasonable efforts made concerning the child[ren]. Upon completion of the hearing, the court shall enter written findings and make a determination identifying a primary permanency goal for the child[ren]. *If a permanency plan is in effect at the time of the hearing, the court shall also make a determination as to whether reasonable progress is being made in achieving the permanency goal and complying with the other provisions of that permanency plan.*

Iowa Code § 232.104(1)(c) (emphasis added). After the hearing, the court has four options:

a. Enter an order pursuant to section 232.102 to return the child[ren]to the child[ren]'s home.

> b. Enter an order pursuant to section 232.102 to continue placement of the child[ren] for an additional six months at which time the court shall hold a hearing to consider modification of its permanency order. An order entered under this paragraph shall enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child[ren] from the child[ren]'s home will no longer exist at the end of the additional six-month period.
>
> c. Direct the county attorney or the attorney for the child[ren] to institute proceedings to terminate the parent-child relationship.
>
> d. Enter an order . . . to . . .(2) [t]ransfer sole custody of the child[ren] from one parent to another parent.

*Id.* § 232.104(2).

Here, a permanency plan was already in place at the time the second order was entered. Though the juvenile court's first order did not explicitly state it was giving the mother six months to work toward reunification, it was implied, based upon the recommendations of all of the parties. Regardless, it found in its first order the mother was making reasonable progress in achieving the permanency goal and complying with the other provisions of that permanency plan, even after she had relapsed and used cocaine. Yet, under essentially the same circumstances, the court found four months later that things had changed such that reunification was no longer a possibility. We disagree.

Given the overreaching goals of chapter 232, as well as the desires of the children, we are troubled by the court's dismissal of the mother's progress in this case. From the get-go, the mother admitted she was a long time cocaine user. This is why the CINA case was initiated. Despite months of relapses early on, the children remained in the mother's care. After their removal in February 2014, the mother suffered some setbacks, most notably relapsing on cocaine August 20, 2014. But, from early October 2014 to the time of the continued hearing in

June 2015, the mother had given over fifty samples for drug testing, and only one established she had relapsed on cocaine. That is amazing progress.

Alcohol is not an illegal substance, and it seems unwise to deem one test that was positive for alcohol a "relapse" in this case, where the initial and only harm recognized was the mother's use of cocaine. Similarly, the "positive" tests on September 30, October 6, and October 30, 2014, for amphetamines and benzodiazepines are actually consistent with the mother's prescribed medications. Moreover, despite the caseworker's suspicion of the mother's test results wherein her creatinine level was low, the facts remain that those samples were further tested by the labs, and the labs determined, based upon their specific-gravity results, the samples were negative for illegal substances.

Yet, even considering these tests as positives for contraband substances, including four tests with a low creatinine level, and even considering the mother's actual relapse on cocaine, everyone, including DHS, was on board with giving the mother an extra six months to work for reunification in January 2015. The only things that changed thereafter was the mother's continuing relationship with her paramour and her two missed drug tests. While we understand the general need to consider a missed test a "dirty" test, the mother's negative test a few days later supports the finding that she had not used illegal substances. None of her other tests thereafter were positive for illegal substances, despite her paramours re-emergence in her life.

Consequently, the overall determination came down to the mother's relationship with her paramour. It appears that once the mother was again connected to her paramour, DHS decided reunification efforts were no longer

warranted. However, children are not entitled to perfect parents. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Moreover, siblings should be kept together whenever possible. *See In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982). We cannot simply look away from all of the progress the mother has made in light of the possibility she might relapse. She was essentially given six months after her last relapse in January 2015, and for some reason, despite the incredibly strong bonds between the mother and the children, the children's requests to stay together and to be returned to their mother, it was decided now it has been too long, and the children need "permanency." This is in spite of the caseworker's testimony that she did not think any harm would come to the children if the mother was given extra time.

The children want to be together and with their mother. The children's GAL recommended additional time be given to the mother for reunification. The children are currently in the care of relatives. Upon our de novo review, we find no reason why additional time for reunification with the mother is not possible. It is not in these children's best interests to presume the mother will be unsuccessful because of a relationship that has caused no harm to the children and potentially resulted in one positive test over the span of eight months.

For all of these reasons, we agree with the mother the juvenile court erred in its June 2015 permanency order in denying her request for additional time for reunification and changing the reunification goals. However, this finding presents

a new issue—how to proceed. Our concern remains the best interests of the children. Over four months have now passed since the last permanency hearing. We hope the mother has continued her progress, but that information is not before us, and we recognize matters may have changed such that reunification would no longer be in the children's best interests. Consequently, upon remand, we direct the juvenile court to hold a permanency-review hearing, and the parties should provide to the court updated case reports of the mother's overall progress and status, with recommendations and potential reunification plans for increasing the mother's visitation with the children to transition them back into her care. If the mother has since relapsed (on cocaine or other illegal substances) or matters have substantially changed, not including the passage of time, such that the children's GAL now recommends against additional time or reunification with the mother, the court, following the hearing, should enter a permanency order thereafter pursuant to Iowa Code section 232.104(2) as it sees fit. Otherwise, the court should amend the permanency goal back to reunification of the children with the mother, adopt a new or modified plan for reunification, and set the matter for rehearing in three to six months pursuant to section 232.104(2)(b).

### IV. Conclusion.

Accordingly, we reverse the juvenile court's June 2015 permanency order, and we remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

**REVERSED AND REMANDED.**