# IN THE COURT OF APPEALS OF IOWA

No. 21-0882
Filed September 22, 2021

**IN THE INTEREST OF D.M.,**
**Minor Child,**

**D.M., Father,**
     Appellant.

_____

Appeal from the Iowa District Court for Lee (North) County, Ty Rogers, District Associate Judge.

A father appeals the termination of his parental rights. **AFFIRMED.**

Justin Stonerook, Burlington, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Robert J. Reding of Dial & Kuckelman Law Office, Keokuk, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Vaitheswaran and Schumacher, JJ.

**BOWER, Chief Judge.**

A father appeals the termination of his parental rights to his child, D.M., born in March 2019.[1] The child is under three years of age, has been adjudicated a child in need of assistance (CINA), has been out of the parents' care for far more than the statutory period,[2] and could not be returned to the father at the time of the termination hearing due to the father's unresolved mental-health and substance-abuse issues. Therefore, grounds for termination exist pursuant to Iowa Code section 232.116(1)(h). On our de novo review, we conclude the father did not carry his burden to show the father-child bond was such that termination of his parental rights would be detrimental to the child; rather, termination of parental rights and adoption will best provide for the child's safety; long-term nurturing and growth; and physical, mental, and emotional condition and needs. We therefore affirm.

*I. Background Facts.*

The child tested positive for marijuana and methamphetamine at birth and was in the mother's custody and care for only four days before voluntarily being placed in foster care. The department of human services (DHS) became involved. The mother reported the father was not taking his prescribed mental-health medication and expressed fear of him because he was abusive. DHS helped the mother move to a domestic-violence shelter. However, after less than two weeks,

---

[1] The mother's rights were also terminated. She did not appeal.

[2] At the time of the termination hearing, D.M. had been out of parental custody for twenty-five months. The statutory period is "at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days." Iowa Code § 232.116(1)(h)(3) (2021).

the mother left the shelter, and DHS did not hear from her for several weeks. The father was arrested on assault charges.

On April 10, the State filed a CINA petition. A May 7 hearing on the petition was continued because the father was hospitalized after a suicide attempt.

The child was adjudicated CINA on June 4, 2019. Pending the disposition hearing, the father was ordered to participate in Family Safety, Risk, and Permanency (FSRP) services; complete mental-health and substance-abuse evaluations and follow through with recommended treatment; and sign all necessary releases requested by DHS and service providers. On June 18, the court entered an ex parte removal order, placing the child in DHS's custody and finding in part:

> [The mother] and [father] have been provided visitation with the children supervised by FSRP. The parents have been cooperative at visitation but are not consistent with their attendance to the visits. Both parents have not confirmed visits timely or have been late to visits on more than one occasion. Both parents agreed to complete substance abuse evaluations. Those evaluations have not yet been completed. [The father] has reported completed drug testing through probation office. [He] was hospitalized for concerns with self-harm and his overall mental health. Since hospitalization [DHS] has not had any contact with [the father] and FSRP expresses that they struggle in making contact with [him].

The father obtained a mental-health assessment on July 26. The father has issues of domestic violence, anger control, and self-reported long histories of substance use (marijuana) and multiple significant mental-health diagnoses. The evaluator recommended the father obtain a psychiatric evaluation and participate in ongoing individual therapy to deal with severe depression, anxiety, and development of appropriate communication skills.

On September 10, a dispositional order was filed, which required the father to comply with services as requested by DHS or providers, cooperate with all services as directed in the case permanency plan, obtain a substance-abuse evaluation and follow through with any recommended treatment, cooperate with substance-abuse aftercare or support programs, cooperate and participate in random drug testing, obtain a mental-health evaluation and follow through with recommended treatment, obtain and maintain safe appropriate housing, and maintain employment. The court ordered funding for family counseling, mental-health and substance-abuse evaluations and treatment, and drug testing.

The father attended a counseling session on August 2. However, he did not attend an August 19 session because he was again in jail. His next scheduled appointment was for September 6, but he did not show. He was discharged from counseling due to lack of attendance. For the remainder of 2019, the father's participation in services was minimal and his visits with the child were sporadic.

A February 25, 2020 report to the court prior to a CINA review hearing noted the father had been arrested in mid-January, had not been in contact with DHS, and had not been provided visits while in jail. When a worker visited the father in jail, she reported he had not been taking his prescribed mental-health medication while incarcerated. The father reported he would be released soon.

In March, the juvenile court filed a CINA review order continuing the father's requirements he comply and cooperate with DHS services, obtain a substance-abuse evaluation and follow through with recommendations, cooperate with random drug testing, obtain a mental-health evaluation and follow through with

recommended services, obtain housing, obtain and maintain employment expectations, cooperate with visitation, and cooperate with paternity testing.

The father was released from jail in March and contacted DHS to resume visits with D.M. However, he did not attend a scheduled meeting with DHS service workers.

An April 14 FSRP report observed:

> Cognitive: [The father] is not aligned with the needs of [the child]. [The father] does not possess adequate knowledge to fulfill his caregiving responsibilities. [He] is not reality oriented. [The father] stated he did not attend interactions with [the child] for fear that he would be arrested.
> Behavioral: [The father] is not physically able to provide care to [the child] at this time due to being incarcerated. [The father] does not demonstrate impulse control as he has continued to engage in illegal activities. [The father] does not set aside his needs for [the child].
> Emotional: [The father] displays concern for [the child]. [The father] does express love toward [the child]. [The father] is not bonded to [the child] due to his limited contact with him.

In a June 2 DHS report to the court in anticipation of a permanency hearing, the DHS worker indicated she had reached the father via phone call on April 10, explained that visits could not be face-to-face due to COVID-19 and would be by video, and shared with the father he needed to follow through with paternity testing and psychiatric testing. Further attempts to contact the father were unsuccessful. The worker recommended the permanency goal be changed to termination of parental rights and the father "complete a comprehensive and thorough psychiatric evaluation with approved court ordered funding and follow through with the recommendations."

In an addendum to her earlier report, the DHS worker noted the father's paternity had been confirmed. The worker also noted she had met with the father on June 18:

> At that time it was addressed that he needed to complete psychiatric testing with Pat Ewing. [The father] reported that he was currently participating in counseling at Counseling Associates and received medication management through his primary care provider. [The father] was asked that he attend drug testing along with paternity testing. [The father] agreed that he would be able to make arrangements for drug testing if given a call the day of testing but shared if he had to leave the county then he would need approval from his [probation officer (PO)]. This worker let him know that worker would speak with his PO for approval for this. Arrangements were also made for visitation between [the father] and [the child]. It was agreed [the father] would have one visit weekly and if he could show consistency in these visits they would be increased. [FSRP provider] scheduled a visit with [the child] and [the father] for the following week.
>
> [The father] was attempted to be reached by phone and then sent a text message on [July 8] that he needed to attend drug testing [July 10]. [The father] was informed that worker had spoken with his PO and that he would be able to leave the county for this. [The father] texted on [July 9] sharing that he needed more of a heads up for testing as he was busy and would not be able to make it. This worker explained through text that it is random drug testing and he was given [two] days advanced notice. [The father] did not attend this testing or respond to workers message.
>
> [The father] was sent for drug testing again on [July 17]. He did attend this and hair stat testing was completed. Hair stat test results were received on [August 5] and these were positive for THC. In prior conversations with [the father] he had maintained that he has been sober since last year.

Further, the report noted the DHS worker had contacted Counseling Associates—the father was not involved in counseling between November 2019 and May 2020, was seen once in June, and did not show in July. Pat Ewing was also contacted and reported receiving a message from the father weeks before about scheduling a psychiatric evaluation. However, Ewing's attempts to reach the father to do set the appointment were unsuccessful. With respect to visits, the

addendum noted the father was inconsistent with visits and the child was hesitant to go to the father.

After a September permanency review hearing, the court found:

That since the time of the last hearing, there has been a continued lack of progress in regards to completion and participation in court-ordered services by both the parents. Very limited contact with [the father] and he has not been involved or communicated with the worker in regards to making arrangement for services and visitation.

However, the mother had made some progress and the court granted an additional six months "at which time the court shall hold a hearing to consider modification of its permanency order."

In a January 20, 2021 progress report by FSRP (now known as Family-Centered Services or FCS), the worker noted the child was well-bonded with the foster family and the father was "trying to get a medical card for THC still" and "waiting for funding for his mental health evaluation."[3] The father indicated he had "various mental health diagnoses," and reported "the only issue regarding his portion of the case was the THC."

A February 14, progress report states, in part:

[The father] has reported that he does not use illegal substances except THC. He said that he is in the process of trying to get a medical marijuana card. He takes daily medication. Evaluations have not been done yet by [the father]. He is in the process of getting his birth certificate for more stable employment.

At a March 9 permanency review hearing, the State indicated an intent to file a petition to terminate parental rights. The parties agreed to combine the

---

[3] It is unclear why the earlier court orders were not sufficient to ensure funding was available.

permanency-review and termination hearings, which would be scheduled after the termination petition was filed.

FCS filed its April 14 progress report, stating, "[The father] reports that he has not set up his evaluations set up yet. Options were discussed for options for psychiatrists. He reports that he will set them up. He reports no use of illegal substances and that he is working regularly." Visits between father and child were fully supervised once a week for two hours, having recently been extended by one-half hour.

On April 27, DHS submitted a report to court for purposes of the combined hearings, noting the father had obtained housing on March 9 and was more consistent with visits. However, the father had not followed through with routine counseling over the course of the case, still had not obtained a psychiatric evaluation, and was not taking his prescribed mental-health medications. Moreover, although a March 2021 substance-abuse evaluation did not recommend treatment, it was because the father "made it clear he did not intend on stopping his use of marijuana and that he was in hopes of obtaining a medical marijuana card."

During the combined permanency and termination hearing held on April 27, evidence was presented the father had been in jail several times (each stay ranging from a week to three months). The court found the father had made some "limited progress" since the March 9 hearing, however, the court noted that to return the child to the father would likely subject the child to adjudicatory harm; "The child's father . . . is habitually in and out of incarceration and cannot care for the child while incarcerated. With the exception of approximately the last month,

[the father] participates very minimally in services and there remain serious concerns regarding his future drug use and mental health." The court observed the father's frequent stays in jail "creat[e] a hectic and unstable environment that would not allow for proper or safe care of the child." The court concluded,

> While the court applauds [the father's] very recent efforts, they are simply too little too late and are not enough to show a stable and consistent ability to properly care and provide for the mental, emotional, physical, and developmental needs of the child. He has not sufficiently addressed his mental health needs nor sufficiently addressed his substance abuse needs.

The court noted there was a "connection" between father and child but the child had a "very strong bond with his current foster parents," with whom he had been placed for seventeen months. The court found the foster parents were willing to adopt the child and provide a permanent home where the child's physical, developmental, psychological, and emotional needs would be met. Thus, the child's best interests would be served by terminating parental rights.

The father appeals.

*II. Scope and Standard of Review.*

Review of all termination proceedings is de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Under de novo review, "[w]e review both the facts and the law and adjudicate rights anew on the issues properly presented." *In re A.T.*, 799 N.W.2d 148, 150–51 (Iowa Ct. App. 2011). "We give weight to the juvenile court's findings, but are not bound by them. Our paramount concern is the child's best interests." *Id.* at 151.

*III. Discussion.*

The father concedes all but the fourth element of Iowa Code section 232.116(1)(h) are established.[4] He argues there is not clear and convincing evidence the child could not be returned to him at the time of the termination hearing because he had a house DHS found suitable for a child, he was employed, there were no concerns mentioned by caseworkers about his parenting ability during visits, and there is no evidence his mental health affects his ability to parent. He also notes he had a clean drug screen in the spring of 2021 and his substance-abuse evaluation recommended no treatment.

Like the district court, we applaud the father's very recent efforts toward housing and job stability. However, we are concerned those efforts did not begin until March 2021 when the child has been out of parental custody since March 2019. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" (citation omitted)). The father has still not adequately addressed his domestic-violence and

---

[4] Section 232.116(1)(h) allows the court to terminate parental rights if all of the following have occurred:
> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents . . . at the present time.

"[A]t the present time" means at the time of the termination hearing. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014).

mental-health issues. He has not obtained a psychiatric evaluation—which was recommended multiple times since July 2019. The father has been court-ordered to follow such recommendations since the child was adjudicated a CINA. The father minimizes these concerns, but we cannot. He reported to the mental-health evaluator that he was negatively affected by domestic violence and child abuse in his childhood home. He noted he suffers from posttraumatic stress disorder, which induces flashbacks. He reported feelings of anxiety and depression and has been hospitalized because he was suicidal. He is prescribed medications to address these concerns and was urged to participate in ongoing individual therapy. He has not followed through with those recommendations and self-medicates with marijuana.

We are not persuaded he can provide a child—or himself—emotional or physical stability and security. He also minimizes the effect his several stays in jail have had on his child's life. Even if two of the charges were dismissed after a time, he has been convicted of domestic-abuse assault, and his absences while avoiding arrest and in jail have necessarily kept him unavailable for services, unable to parent, and missing the opportunity for parent-child bonding. The father's ability to attend to a child for two hours once a week while fully supervised does not carry much weight in the balance. "Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." *In re T.J.O.*, 527 N.W.2d 417, 422 (Iowa Ct. App. 1994). We conclude there is clear and convincing evidence the child could not be safely returned to the father's care at the time of the termination hearing.

The father next asserts termination is not appropriate due to the closeness of his bond with the child. Iowa Code section 232.116(3)(c) allows the juvenile court to avoid termination if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." We note the application of the statutory exception to termination is "permissive, not mandatory." *A.M.*, 843 N.W.2d at 113. The juvenile court found there was a "connection" between father and child but a "strong bond" between child and foster parents. We find the evidence of the father's connection insufficient to show "termination would be detrimental to the child . . . due to the closeness of the parent-child relationship" *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (noting the parent resisting termination bears the burden to establish an exception to termination).

Finally, the father asserts termination is not in the child's best interests. This child has been out of parental custody for all but four days of the child's life and for far more than the statutory period. The statutory period has been far exceeded here, and we must view the situation with a sense of urgency. *See C.B.*, 611 N.W.2d at 495.

Giving "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child," *see* Iowa Code § 232.116(2), the child has been integrated in a pre-adoptive and suitable foster home. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home

for the child." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (citation omitted).  We conclude termination of the father's rights is in the child's best interests.  We affirm.

**AFFIRMED.**