# IN THE COURT OF APPEALS OF IOWA

No. 22-0949
Filed August 31, 2022

**IN THE INTEREST OF A.U. and J.U.,**
**Minor Children,**

**F.B., Mother,**
        Appellant,

**N.U., Father,**
        Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Joan Black, District Associate Judge.

A mother and father separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Kristin L. Denniger of Denniger Law Firm, Mount Vernon, for appellant mother.

Caleb T. Detweiler of Honohan, Epley, Braddock & Brenneman, LLP, Iowa City, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Anthony Haughton of Linn County Advocate Inc., Cedar Rapids, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

Parents who immigrated from Africa separately appeal the termination of their parental rights to the two youngest of their five children under Iowa Code section 232.116(1)(h) (2022). Claiming that cultural differences were the motivating factor in terminating their parental rights, the parents challenge each of the three steps in the termination process. The father also claims he should have been granted more time to work toward reunification. We affirm.

## I.    Background Facts and Proceedings

Since 2013, this family has been the subject of sixteen child abuse investigations or assessments by the Iowa Department of Human Services. During many of these, the mother was left alone with the children while the father was in Africa for months at a time. The first report was made when the mother was in a car accident. After she was taken to the hospital, the mother told staff that she had left her eight-month-old child home alone while she went to the store.

In 2016, the department investigated four reports about the family. In each, the mother reported she was overwhelmed with caring for the three children the family had then. Workers consistently noted the home was dirty, with dishes piled in the sink, food spilled on the floor, and pest infestations. A child-in-need-of-assistance case was filed that year and closed the following.

Despite the services provided in the first case, the same issues continued to be reported to the department. In 2018, the family was living in a dilapidated trailer. A report was made that there was "a metal door frame laying in the home, garbage throughout the home, no windows in the home, [and] no utilities or

electricity." The parents were also allowing the children "to freely roam the trailer park." Services were again provided, but the reports continued.

In the spring of 2019, a child protective worker with the department noted the home was "in disarray, with laundry covering the couch and floors," and "dirty dishes stacked in the sink & counters, as well as mouse droppings in the windowsills." Later that year, the oldest child was almost hit by a car while riding her bike in the street. When the police arrived to assist, they discovered the child had been left home alone after school. She was six years old at the time. While at the home, police observed it was "uninhabitable" and in "deplorable condition":

> [T]here was fish in the refrigerator and it is no longer working, leaving the home with an over[whelming] smell of rotten fish. The home is filled with flies and other insects. There are mice seen running throughout the home. There is no electricity and there is evidence of raw sewage in the bathroom.

The children were removed from the parents' care, and child-in-need-of-assistance proceedings were started. Two months later, the mother gave birth to the couple's fourth child—A.U. Hospital staff reported the baby was "having issues with feeding and [the mother] has shown no interest in learning how to ensure that the child is eating sufficiently and has made no attempts to feed the child." The father had not been to the hospital since the baby was born. Like her older siblings, A.U. was removed from her parents' care, and a child-in-need-of-assistance petition was filed. A.U. was discharged from the hospital about a week later with a feeding tube.

The juvenile court confirmed A.U.'s removal after a contested hearing, directing in its order that because of "language barriers, all efforts should be made to provide interpreting [for] the mother or father," who spoke Swahili and French,

when services were being provided. The parents stipulated that A.U. was a child in need of assistance under Iowa Code section 232.2(6)(c)(2) (2019) and began trying to get all of their children back in their care.

To that end, the mother completed a psychological evaluation in September. While the results were limited because of language barriers, she was diagnosed with postpartum depression and post-traumatic stress disorder. The psychologist noted the mother appeared "to be completely overwhelmed." He suspected that she "was not comprehending expectations and that may be cultural difficulties or it may reflect the severity of her current depression." The psychologist recommended support services for the mother "in which someone would come in the home and teach her basic. cleaning techniques and basic child-rearing strategies. She comes from an equatorial country and strategies and expectations for hygiene may be much different there."

Those services were provided to the parents and helped for a time. A trial home placement was approved for the three oldest children at the end of 2019 despite a report from the second oldest child that the mother had hit him with a cell phone charger cord. The parents' visits with A.U. remained fully supervised because the mother struggled to feed her as medically directed. During this time, a department caseworker noted:

> In terms of [A.U.], [the father] is nearly non-existent in her life. He does not attend visits and has not attended any doctor appointments since very early on in this case. [The mother] is left to be the one raising all of the children and adding [A.U.] to the mix just seems to be too much for her to handle.

The caseworker recommended the older children remain in their trial home placement, even though the condition of the home was deteriorating again, but suggested termination of parental rights for A.U.

At the permanency hearing for A.U., the juvenile court elected to give the parents another six months to work toward reunification. Custody of the oldest three children was returned to the parents in April 2020 under the protective supervision of the department. But reunification with A.U. was stalled because of COVID and also because "it appears that [the mother] cannot handle all of the children in the home." As for the home environment, the caseworker observed it was "not ideal, but it is in a better state than it was when this case began."

Despite some remaining concerns, A.U. began a trial home placement in mid-July. The mother gave birth to J.U. about one week later. An August report to the court noted the mother "has been doing very well. . . . [She] seems to be handling the stress of having 5 children in the home fairly well." In summary, the report stated the parents

> have made a lot of progress in this case. They are doing a better job of parenting their children and, as far as this worker can tell, have been providing them with [age-appropriate] supervision. This worker feels that the parents have made substantial enough progress that it is now safe to return custody of [A.U.] So long as they continue to provide age-appropriate supervision to the children, maintain the cleanliness of the home and are able to provide for the needs of the children, [the parents] should have no trouble maintaining custody.

Unfortunately, the parents had trouble meeting those expectations, even with the continued assistance of the department. Custody of A.U. was returned to the parents in August 2020, and services continued into 2021. But by May, the condition of the home had deteriorated, as had the parents' care of the children.

Once again, the second oldest child reported the mother hit him with a cell phone charger cord. He also said that she cut him with a piece of glass. The mother said the child was lying, but the child protective worker saw that he had marks consistent with the abuse he reported. Several more reports were made in June, one of which alleged the home had "feces on the floor, old food lying around, flies in the home, food stuck to the walls, and floors that are sticky." A second report alleged the mother would lock the children out of the home after their father went to work. This report was made when the three oldest children were found walking on the highway. The mother was hostile and belligerent to the workers investigating the reports, with one noting she was "definitely tired of cooperating with" the department.

These reports resulted in a child-in-need-of-assistance case for J.U. at the end of June. She and A.U. were removed from the parents' custody, although they were then allowed to remain in the home under a trial home placement. The oldest three were placed with a friend from the family's church. The trial home placement for the two youngest children "did not go well," according to the department's caseworker. The placement ended less than a month after it started when the mother left an opened bottle of floor cleaner within reach of J.U. A worker who happened to be present took it from J.U. so that she would not drink it. The mother then put it back in the same spot again. She also told the worker that she was planning to put mouse poison in places that would be accessible to the children.

The parents did not respond well to services after this removal. The mother was often distracted during visits, sometimes falling asleep, showering, or playing on her phone rather than interacting with the children. She consistently reported

being tired during the two-hour visits and readily agreed to shorten them by a half hour. The father participated in only a few visits after the children were removed, stopping them altogether in September and then leaving for Africa in November. The condition of the home remained a concern, so much so that the mother moved out of the trailer and into an apartment. But the cleanliness of her apartment soon declined, with workers often observing spilled food and puddles of water on the floor, and dirty dishes in the sink. At the permanency hearing for A.U. and J.U. in January 2022, the department recommended termination.[1]

The State filed termination petitions and, following a hearing, the juvenile court entered an order terminating both parents' rights to A.U. and J.U. under Iowa Code section 232.116(1)(h) (2022). The parents appeal.

## II. Analysis

We apply a three-step analysis in conducting our de novo review of terminations of parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) (noting that in conducting our de novo review, we "give weight to the [court's] factual findings but are not bound by them"); *see also* Iowa Code § 232.116(1)–(3). If all three steps support termination, we consider any ancillary issues raised by the parents, such

---

[1] The State did not recommend termination for the three oldest children because they hadn't been removed from their parents' care for long enough. They were instead continued in their foster care placement.

as whether additional time should be granted. *See* Iowa Code § 232.117(5); *see also id.* § 232.104(2)(b).

### A.    Grounds for Termination

The parents both argue the State failed to prove the final element of Iowa Code section 232.116(1)(h)—that the children could not be returned to their care at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4) (requiring "clear and convincing evidence that the child cannot be returned to the custody of the child's parents . . . at the present time"); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing").

Starting with the father, he focuses on a report that criticized him for not getting down on the floor to play with the children. The father argues that while "he will not be nurturing in the manner of an American parent," he will ensure the children's "housing is appropriate, and they are not subjected to physical punishment while in his care." The problem is that the father did not meet even his own minimal expectations in the years the case was open. Although he worked fairly consistently, the father sent much of his income to family in Africa. The father did make some needed repairs to the home early on in the case, but then he allowed it to fall into disrepair again. And he did not intervene in the mother's discipline of the children, the oldest of whom reported that she hit them on multiple occasions with cell phone charger cords.

The father was largely absent from the children's lives. He made at least two trips to Africa while the case was open, the most recent after the children were placed into foster care at the end of June 2021. The father had only a few visits

with the children between their removal and his trip to Africa in November. When he returned in January 2022, the father's visits continued to be sporadic. He had just four in February. And at each of those visits, he was present for thirty minutes or less. *See In re A.B.*, 957 N.W.2d 280, 299-300 (Iowa 2021) (affirming termination of father's parental rights under section 232.116(1)(h) where he only participated in visitation sporadically and a caseworker testified that he could not be a primary caretaker due to his ambivalence). Despite multiple opportunities to care for the children, the father failed to show that he had the desire to do so. We accordingly find the State proved termination of the father's parental rights under section 232.116(1)(h).

Turning to the mother, she argues the family support specialist identified four concerns with the family that drove the termination recommendation: (1) providing a safe environment; (2) food safety; (3) proper supervision; and (4) lack of active parenting. The mother contends she remedied each of these concerns. But the record does not support this contention. Although the mother abandoned the uninhabitable trailer for an apartment, her landlord reported there were "bug problems in the complex and a foul odor coming from" the mother's apartment. As for food safety, the family support specialist testified the mother "tried to feed the children food that has either been left out all day or has not been properly refrigerated." The mother denied this, but the juvenile court did not find her testimony to be credible. *See id.* at 293 (deferring to the court's credibility determinations).

The mother also minimizes the supervision concerns noted by the department, suggesting they were limited to leaving hand sanitizer, candles, and

a butcher knife within reach of the children. Those concerns were only part of the story though. The family support specialist testified that during the visits, the mother "often spends her time in the kitchen as well as the bathroom or the side room" and leaves the children unsupervised in the living room. The mother's inattention to the children has been a persistent aspect of her parenting and led to multiple founded child abuse reports. *See In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990) (noting a "parent's past performance . . . may indicate the quality of care the parent is capable of providing in the future").

More concerning is the mother's physical abuse of the children—an issue she largely ignores on appeal. The children consistently reported their mother would hit them with cell phone charger cords when she was angry. The second oldest child had marks on his wrist and back consistent with being struck with a cord. The mother denied hitting the children, testifying that her second oldest child "wasn't telling the truth." *See In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1998) (noting "the requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs"). Overall, we agree with the juvenile court that the mother "lacks insight into the reality of her parenting deficits," which impacts her ability to safely care for these young children. *See In re A.M.*, 843 N.W.2d 100, 111–12 (Iowa 2014) (finding termination appropriate under section 232.116(1)(h) where the parents could not internalize the necessary skills to keep their child safe "without the hovering supervision of [department] workers").

While this case may be "infused with cultural differences," as the mother contends on appeal, those cultural differences did not lead to the juvenile court's

finding that the children could not safely be returned to their parents' care. Unlike *In re F.C.*, No. 13-0971, 2013 WL 5758058, at *4 (Iowa Ct. App. Oct. 23, 2013), which the mother cites in support of this claim, the record does not show that "language barriers and cultural differences . . . resulted in the mother not always understanding what the case worker expected." Translation services were used throughout the proceedings, not just in court but at some visits, family team meetings, and medical appointments. Despite the extra efforts undertaken by the department, and the years of services provided to the family, the mother has made only minimal improvements. We find clear and convincing evidence supporting the termination of the mother's parental rights under section 232.116(1)(h).

### B.     Best Interests

The parents next claim that termination of their parental rights is not in the children's best interests. In examining this issue, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

The mother contends termination of her parental rights is not in the children's best interests because "sibling separation is likely, and the children will be removed from their cultural heritage." While both of these factors are considered in the analysis, *see In re T.J.O.*, 527 N.W.2d 417, 421 (Iowa Ct. App. 1994); *In re L.L.*, 459 N.W.2d 489, 496–97 (Iowa 1990), the defining elements of a child's best interests are safety and need for a permanent home. *See In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

As discussed above, the parents were simply unable to provide for the children's safety or their physical, mental, and emotional condition. Though the youngest two children are separated from their siblings, they were thriving in their foster home, according to the department caseworker. *See* Iowa Code § 232.116(2)(b) (considering integration of a child into a foster family). Given the risks presented for the children in their parents' home, we cannot say the factors cited by the mother outweigh the other factors in favor of termination. *See L.L.*, 459 N.W.2d at 497 (concluding a child's loss of cultural identity did not "outweigh all the other factors we must consider on the question of termination"); *see also In re W.A.*, No. 16-1774, 2017 WL 104975, at *3 (Iowa Ct. App. Jan. 11, 2017) ("We cannot place the importance of the sibling bond over the individual safety and well-being of each of the children.").

## C. Statutory Exception

As is often the case, both parents also mention their bond with the children as part of their best-interest argument. From this, we infer the parents are asking that we apply the permissive exception to termination in Iowa Code section 232.116(3)(c), which authorizes the court to forgo termination when it "would be detrimental to the child[ren] . . . due to the closeness of the parent-child relationship." *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (noting application of an exception to termination in section 232.116(3) is "permissive, not mandatory"). Neither parent met their burden to establish that exception applies here. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). The providers involved with the family testified that while the children had somewhat of a bond with their

parents, it was not a strong one. As a result, we conclude this exception to termination does not apply.

### D. Additional Time

At the end of his best-interest argument, the father asks us to exercise our

> discretion in allowing him additional time, and to direct the Department to provide a culturally and linguistically fluent visitation supervisor, and allow visitation to progress despite the lack of a traditional American parenting style, so that he might demonstrate that he is able to safely and effectively raise his children.

We deny these requests.

By the time of the termination hearing, the parents had been participating in services for close to three years with no meaningful progress. *See* Iowa Code § 232.104(2)(b) (stating a six-month extension is appropriate if the parent can establish that "the need for removal . . . will no longer exist at the end of the additional six-month period"); *accord In re W.T.*, 967 N.W.2d 315, 232 (Iowa 2021). So we cannot agree that giving the father more time, particularly when he squandered much of the time he was given, would lead to a different result.

As for the father's request for "a culturally and linguistically fluent visitation supervisor," complaints about services are properly raised "at removal, when the case permanency plan is entered, or at later review hearings." *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002). Because the father did not raise this request at the proper time, the issue is waived. *See In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017).

**AFFIRMED ON BOTH APPEALS.**